**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBIN AMER, CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) ) ) ) ) ) ) | Case No. |
| | ) | **DEMAND FOR JURY TRIAL** |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ELEVEN LABS INC., a Delaware corporation, | ) ) ) | |
| Defendant. | ) ) | |

**COMPLAINT**

Plaintiffs Robin Amer, Carol Marin, Philip Rogers, Alison Flowers, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif, individually and on behalf of all others similarly situated, by their attorneys Loevy & Loevy, and for their complaint against Defendant Eleven Labs Inc. ("ElevenLabs"), allege as follows:

**NATURE OF THE CASE**

1. Eleven Labs Inc. ("ElevenLabs") built an $11 billion business by taking the voices of professional voice workers — journalists, broadcasters, audiobook narrators, podcasters, voice actors, and other speakers whose recorded voices are publicly distributed — and using them to train commercial artificial-intelligence products that clone a human voice from a short audio

sample. The voiceprint is not a backstage input to those products. It is the product. ElevenLabs ingested the recorded voices of real people, including Plaintiffs. It extracted the speaker's unique biometric voiceprint from each recording. It embedded those voiceprints in foundational voice synthesis models that today power a platform reported to generate more than $500 million in annual recurring revenue. None of the speakers whose recordings supplied the substrate of those products was asked. None was told. None was paid. At this point, the biometric data and the product are the same thing.

2. Plaintiffs are seven Illinois residents whose recorded voices are among the most distinguished in their fields. They include Carol Marin, a five-decade broadcast journalist, three-time George Foster Peabody Award winner, and recipient of the 2025 Order of Lincoln, the State of Illinois's highest civilian honor; Yohance Lacour, the creator, host, writer, and lead reporter of *You Didn't See Nothin'*, awarded the 2024 Pulitzer Prize for Audio Reporting and a Peabody Award; Alison Flowers, a 2021 Pulitzer Prize finalist for the investigative podcast *Somebody*; Robin Amer, a three-time duPont–Columbia honoree and creator of USA Today's *The City*; Philip Rogers, a National Emmy and Edward R. Murrow Award–winning broadcaster who covered four decades of Chicago news at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago); Lindsey Dorcus, a SOVAS Award and Independent Audiobook Award winning narrator of more than two hundred audiobooks for Penguin Random House, Simon & Schuster, Macmillan, Hachette, Audible Studios, and the other major American publishers; and Victoria Nassif, a first-generation Lebanese-

2

Palestinian American audiobook narrator whose authentic Arabic-accented narrations have been commercially released by Penguin Random House, Hachette, and Simon & Schuster.

3.      A voiceprint is a digital fingerprint of a person's voice. It is a mathematical signature of the acoustic features unique to that voice. It identifies the individual and cannot be changed. A Social Security number can be reissued. A password can be reset. A credit card can be canceled. A person whose voiceprint has been taken cannot recover it by altering their voice; the biological and behavioral patterns that produced the voiceprint are the same ones the person uses to speak every day.

4.      The Illinois General Assembly enacted the Biometric Information Privacy Act, 740 ILCS 14/1 *et seq.* ("BIPA"), to address this very danger. BIPA recognizes that biometric identifiers, expressly including voiceprints, are "biologically unique to the individual" and that, once compromised, "the individual has no recourse." 740 ILCS 14/5(c). Before any private entity may collect a voiceprint, BIPA requires written notice of the specific purpose and duration of collection, together with a written release. 740 ILCS 14/15(b). ElevenLabs satisfied none of those requirements with respect to Plaintiffs. It collected Plaintiffs' voiceprints from third-party platforms without notice, extracted biometric signatures from recordings Plaintiffs had created for journalistic, literary, and artistic purposes, and embedded those signatures in commercial AI voice models. Plaintiffs have identified no public mechanism,

policy, or process by which ElevenLabs deletes biometric data extracted from non-user training audio.

5.     ElevenLabs' noncompliance was not a misreading of the statute. ElevenLabs is fully capable of obtaining consent — it does so for celebrities. In November 2025, ElevenLabs launched its "Iconic Marketplace," a licensing program under which the estates of Maya Angelou and Alan Turing, and living celebrities including Michael Caine and Matthew McConaughey, must affirmatively approve any commercial use of their voices before ElevenLabs generates audio output using those voices. ElevenLabs built that consent infrastructure. It operates that consent infrastructure today. It declined to extend that infrastructure, or any equivalent process, to the working voice professionals whose voiceprints had already been ingested into the foundational models on which the entire Iconic Marketplace and the entire company sit. ElevenLabs built consent infrastructure for the celebrities it could not avoid asking, and built none for the working voice professionals whose voiceprints constitute the substrate of every product ElevenLabs sells.

6.     ElevenLabs' noncompliance was also not due to a lack of awareness. BIPA has been the law in Illinois since 2008. By the time ElevenLabs publicly released its beta platform in January 2023, BIPA had produced privacy settlements of approximately $650 million against Facebook, $100 million against Google, and $92 million against TikTok. ElevenLabs' privacy disclosures contemporaneously acknowledged that the data ElevenLabs processes is, or may be, biometric data. ElevenLabs' Privacy Policy concedes

that "applicable law may define [users'] Voice Data as biometric data." Its EU–US Data Privacy Framework Policy says the same. Its CCPA Notice at Collection describes ElevenLabs' processing as "analyz[ing] [the speaker's] speech characteristics to formulate a distinct voice model of [the speaker's] vocal traits." These admissions came years after the unconsented training that gave the company its commercial value. ElevenLabs did nothing to remediate it.

7. Nor was ElevenLabs' noncompliance a failure of notice. In August 2024, two professional voice actors filed *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. Aug. 29, 2024), alleging that ElevenLabs had created two of its default synthetic voices, "Bella" and "Adam," by training on copyrighted audiobook narrations of their work, without their knowledge or consent. The *Vacker* complaint alleged that ElevenLabs' voice clones "mimicked the actors' distinctive vocal timbres, accents, intonation, pacing, vocal mannerisms, and speaking styles." That action settled on confidential terms in August 2025. ElevenLabs has not, to Plaintiffs' knowledge, publicly identified the speakers whose recordings it used to train its commercial voice models, nor has it offered any process by which such speakers may obtain identification or deletion of biometric data derived from their voices. ElevenLabs operated through the pendency of *Vacker*, settled it confidentially, and continued the conduct.

8. ElevenLabs' noncompliance was, instead, a deliberate institutional decision. Compliance with BIPA would have required ElevenLabs to identify the source speakers whose recordings it ingested, provide written notice of the

specific purpose and duration of collection, and obtain a written release from each speaker before ingestion. With foundational voice models trained on voice recordings of, on information and belief, hundreds of thousands of distinct speakers, that compliance burden would have constrained the speed and scale of ElevenLabs' voice AI development. ElevenLabs chose speed and scale over compliance. That was not an oversight. It was a business decision.

9.      The voiceprints ElevenLabs extracted from Plaintiffs and the Class are not stored in a database that can be deleted on request. They are encoded in or operationalized through the parameters of ElevenLabs' commercial voice synthesis models — the Eleven English, Multilingual, Flash, Turbo, and v3 model families — and reproduced in the audio that those models generate when invoked through ElevenLabs' text-to-speech, Voice Cloning, AI Dubbing, Conversational AI, Voice Design, and audiobook generation products. ElevenLabs has further transmitted those models and the encoded biometric characteristics they carry to affiliates, vendors, processors, and Enterprise sub-licensees in the United States, the Netherlands, and Singapore under the sub-licensable license asserted in its Terms of Service. The product has already been distributed.

10.     The technology ElevenLabs built using Plaintiffs' voices now competes with Plaintiffs in the markets where they earn their livings. ElevenLabs markets its products as commercial substitutes for professional audiobook narration, voiceover work, podcast hosting and narration, AI dubbing, conversational voice agents, and other categories of professional voice

6

work. Traditional audiobook narration costs $250 to $400 per finished hour; ElevenLabs' Pro plan costs $99 per month and, using its AI voice technology, can generate an entire audiobook in several hours. ElevenLabs' audiobook product offers direct distribution to Spotify, InAudio, and ElevenReader, with a 60% royalty on direct sales. Each of these products is offered to commercial customers at a fraction of the cost of hiring the human professionals whose unconsented recordings made the synthesis possible.

11. Plaintiffs' injuries are concrete and particularized. ElevenLabs extracted Plaintiffs' voiceprints without notice or consent, depriving them of the right BIPA guarantees to make an informed decision about the collection and use of their biometric data. ElevenLabs retains those voiceprints in its commercial models and continues to profit from them. The voiceprints cannot be recovered or replaced. The technology built on those voiceprints now displaces Plaintiffs in the markets where they earn their living.

12. Plaintiffs bring this action under BIPA, 740 ILCS 14/15(a)–(e), alleging that ElevenLabs unlawfully collected, retained, profited from, disseminated, and inadequately protected Plaintiffs' voiceprints, without notice, informed written consent, a written release, or any publicly available retention and destruction policy applicable to non-users. Plaintiffs also assert that ElevenLabs' commercial use of their voices and identities to build and sell AI products that replicate their distinctive vocal characteristics violates the Illinois Right of Publicity Act ("IRPA"). Plaintiffs further assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Illinois

Uniform Deceptive Trade Practices Act ("IUDTPA"), and the common law of unjust enrichment.

13.     Plaintiffs seek statutory and actual damages, restitution and disgorgement of profits derived from ElevenLabs' commercial exploitation of Plaintiffs' and Class members' biometric data, and consequential injunctive relief — including the identification of the sources of the voice training data used to build ElevenLabs' foundational voice synthesis models, the destruction of voiceprints unlawfully obtained from Plaintiffs and the Class, and the destruction or retraining, without the unlawfully obtained biometric data, of the foundational voice synthesis models and downstream commercial products in which the biometric data is encoded. Plaintiffs also seek reasonable attorneys' fees and costs.

## **PARTIES**

14.     Plaintiff Carol Marin ("Marin") is a citizen of the State of Illinois and resides in this District. Marin is a broadcast journalist whose career has been conducted primarily in Chicago for over five decades. Marin's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted her voiceprint are described at ¶¶ 67-71.

15.     Plaintiff Yohance Lacour ("Lacour") is a citizen of the State of Illinois and resides in this District. Lacour is a journalist and audio storyteller whose investigative podcast work, including the Pulitzer Prize–winning *You Didn't See Nothin'*, has been produced in Chicago. Lacour's body of professional

voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted his voiceprint are described at ¶¶ 72-76.

16. Plaintiff Alison Flowers ("Flowers") is a citizen of the State of Illinois and resides in this District. Flowers is an investigative journalist and audio producer who produces her audio reporting from Chicago through her production company Spiralbound. Flowers's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted her voiceprint are described at ¶¶ 77-81.

17. Plaintiff Robin Amer ("Amer") is a citizen of the State of Illinois and resides in this District. Amer is a journalist, podcast creator, audio producer, and on-air host whose work has been produced substantially in and from Chicago, including as creator and host of USA Today's *The City* and as Managing Editor of *Love + Radio*. Amer's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted her voiceprint are described at ¶¶ 82-86.

18. Plaintiff Philip Rogers ("Rogers") is a citizen of the State of Illinois and resides in this District. Rogers is a broadcast journalist whose four-decade career was conducted in and from Chicago, primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago). Rogers's body of professional voice work, the public availability of his recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted his voiceprint are described at ¶¶ 87-91.

19. Plaintiff Lindsey Dorcus ("Dorcus") is a citizen of the State of Illinois and resides in this District. Dorcus is a professional audiobook narrator

who has recorded more than two hundred audiobooks for the major American publishers from her home recording studio in Chicago. Dorcus's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted her voiceprint are described at ¶¶ 92-96.

20. Plaintiff Victoria Nassif ("Nassif") is a citizen of the State of Illinois and resides in this District. Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose professional voice work is produced primarily in Illinois. Nassif's body of professional voice work, the public availability of her recordings, and the basis for Plaintiffs' allegation that ElevenLabs extracted her voiceprint are described at ¶¶ 97-101.

21. Defendant Eleven Labs Inc. ("ElevenLabs") is a Delaware corporation with its principal place of business at 169 Madison Avenue, Suite 2484, New York, New York. ElevenLabs develops, trains, deploys, and commercially operates the foundational voice synthesis models at issue in this Complaint, together with the commercial voice products built on those models. ElevenLabs conducts the collection, capture, receipt through trade, retention, profiting from, and dissemination of voiceprints and biometric information alleged in this Complaint directly and through its officers, employees, agents, affiliates, vendors, and service providers, in the ordinary course of its business.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). The amount in controversy exceeds $5,000,000 in the aggregate, exclusive of interest and costs. The proposed Class includes more than 100 members. Minimal diversity is satisfied: Plaintiffs are citizens of Illinois, and ElevenLabs is, on information and belief, a citizen of Delaware (its state of incorporation) and New York (its principal place of business). None of the exceptions to CAFA jurisdiction set forth in 28 U.S.C. § 1332(d)(3)–(5) applies.

23.     The aggregate amount in controversy substantially exceeds $5,000,000. BIPA provides that an aggrieved person may recover the greater of liquidated damages or actual damages — $1,000 for a negligent violation, or $5,000 for an intentional or reckless violation — and may recover those statutory damages on a per-person, per-subsection basis where multiple distinct provisions of § 15 are violated, consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026). Plaintiffs seek recovery under five distinct BIPA subsections — § 15(a), (b), (c), (d), and (e) — each of which creates a distinct duty and supports a distinct per-person statutory or actual damages recovery, as well as recovery under IRPA, ICFA, IUDTPA, and common-law unjust enrichment.

24.     This Court has specific personal jurisdiction over ElevenLabs under the Illinois long-arm statute, 735 ILCS 5/2-209, and consistent with the due process requirements of the Fourteenth Amendment as construed in

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985); *Calder v. Jones*, 465 U.S. 783 (1984); *Walden v. Fiore*, 571 U.S. 277 (2014); *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255 (2017); and *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351 (2021). ElevenLabs has purposefully directed its conduct at Illinois; Plaintiffs' claims arise out of and relate to that Illinois-directed conduct; and the exercise of jurisdiction is reasonable.

25. ElevenLabs purposefully availed itself of the privilege of conducting business in Illinois. ElevenLabs markets, sells, and delivers its commercial voice synthesis products — including text-to-speech, Instant Voice Cloning, Professional Voice Cloning, AI Dubbing, Voice Design, Conversational AI, audiobook generation, and the Iconic Marketplace — to Illinois subscribers and Illinois-based commercial users through its website (https://elevenlabs.io) and its mobile applications on iOS and Android. ElevenLabs offers tiered subscription plans (free, Starter, Creator, Pro, Scale, and Enterprise) to Illinois residents as part of its ordinary commercial operations, accepts recurring subscription payments from Illinois customers, and provides ongoing interactive service performance to users located in Illinois. ElevenLabs has publicly represented that employees at over seventy-five percent of Fortune 500 companies use its technology; Illinois is the corporate home of more than thirty Fortune 500 companies, including Walgreens, Allstate, Caterpillar, Abbott Laboratories, Archer-Daniels-Midland, and McDonald's. ElevenLabs' platform identifies Illinois users through IP geolocation, the navigator.geolocation API,

12

and equivalent platform interfaces; segments user data by geographic location through web and mobile analytics; serves Illinois traffic through a content-delivery network with an edge node located in the Chicago/ORD region; and sends transactional communications, account confirmations, and feature announcements to Illinois users.

26. ElevenLabs could restrict its services so they could not be accessed in Illinois; it has chosen not to do so. ElevenLabs is therefore aware that it does business with Illinois residents, derives substantial revenue from Illinois subscribers, and delivers AI-generated voice outputs into Illinois on a continuous basis.

27. Plaintiffs' claims arise out of and relate to ElevenLabs' Illinois-directed conduct under both the relating-to standard of *Ford Motor Co.*, 592 U.S. at 362–66, and the effects test of *Calder v. Jones*, 465 U.S. at 789–90. The biometric data at issue was generated in Illinois: Plaintiffs' voices were produced by Plaintiffs while they were physically present in Illinois; the audio recordings embodying those voices were created in Illinois; and the recordings were published from Illinois to publicly accessible platforms on which Plaintiffs' name and Illinois affiliation were publicly visible at all times relevant to ElevenLabs' acquisition, as alleged in ¶ 53. ElevenLabs' acquisition of those recordings was the acquisition of identifiable Illinois-origin biometric data from identifiable Illinois speakers — not the passive receipt of an anonymized dataset assembled by a third party.

28. ElevenLabs' continuing conduct is itself Illinois-directed: ElevenLabs sells subscriptions and AI-generated voice outputs to Illinois subscribers on a continuing basis through the same foundational voice models trained on the biometric data at issue; every Illinois transaction in those products monetizes the biometric extraction that gives rise to Plaintiffs' claims. ElevenLabs' Illinois-directed contacts are not incidental to this Complaint; they are the downstream commercialization of the upstream biometric extraction that gives rise to it. The notice, disclosures, and written release that BIPA required would have been directed to Plaintiffs in Illinois. The resulting invasion of biometric privacy, the loss of control over Plaintiffs' biometric data, and the ongoing harm from ElevenLabs' possession, retention, use, and commercial exploitation of that data were and are suffered in Illinois. ElevenLabs intentionally acquired the biometric data of Illinois speakers, knew or should have known that the harm from that acquisition would be felt in Illinois, and continues to direct commercial activity into Illinois that monetizes that biometric data. The conduct is expressly aimed at Illinois within the meaning of *Calder* and *Walden.*

29. Exercising specific personal jurisdiction over ElevenLabs in this District is reasonable. Illinois has a strong and particularized interest in providing a forum for redress of the unlawful collection and commercial exploitation of biometric identifiers from voice recordings produced or recorded within its borders — an interest the Illinois General Assembly expressly identified in enacting BIPA, 740 ILCS 14/5, and that the Illinois courts have

repeatedly enforced. Plaintiffs, as Illinois residents whose biometric privacy was invaded in Illinois and whose recordings were produced in Illinois, have a corresponding interest in litigating their claims in their home forum. The burden on ElevenLabs of litigating in Illinois is not undue: ElevenLabs is, on information and belief, valued at approximately $11 billion and has raised approximately $850 million in venture capital across multiple rounds; conducts intentional nationwide commerce through its platform; maintains ongoing subscription relationships with Illinois customers; and has the resources to litigate in any federal forum. ElevenLabs could reasonably anticipate being haled into Illinois courts for claims arising from its extraction and commercial exploitation of biometric identifiers from voice recordings produced or recorded in Illinois.

30.     Venue is proper in this District. Under 28 U.S.C. § 1391(b)(2), a substantial part of the events giving rise to Plaintiffs' claims occurred in this District: Plaintiffs reside in this District; Plaintiffs' voice recordings were created, performed, and made publicly available from this District; the biometric data ElevenLabs extracted from those recordings is District-origin biometric data; the notice, disclosures, and written release that BIPA required would have been directed to Plaintiffs in this District; and ElevenLabs' ongoing commercial exploitation of the biometric data — through subscription sales, API performance, and the delivery of AI-generated voice outputs to users in this District — is a continuing course of Illinois-directed conduct giving rise to Plaintiffs' claims in this District. Independently, under 28 U.S.C. § 1391(b)(1)

and (c)(2), ElevenLabs is deemed to reside in this District because its Illinois- and District-directed contacts, as alleged in ¶¶ 25–28, are sufficient to subject it to personal jurisdiction in this District as if this District were a separate State.

**FACTUAL BACKGROUND**

*ElevenLabs and Its Voice Business*

31.     ElevenLabs was founded in 2022 and publicly released its beta voice platform on or about January 23, 2023. ElevenLabs has raised approximately $850 million in venture capital across multiple rounds: $2 million in pre-seed funding in January 2023; $19 million at an approximate $100 million valuation in June 2023; $80 million at a $1.1 billion valuation in January 2024; $180 million at a $3.3 billion valuation in January 2025; and $500 million at an approximately $11 billion valuation in February 2026.

32.     ElevenLabs has publicly reported crossing $330 million in annual recurring revenue by early 2026 and $500 million in annual recurring revenue by May 2026. The company employs approximately 600 people. ElevenLabs has stated that employees at over 75% of Fortune 500 companies use its technology. ElevenLabs has also stated that over 1 million users registered within six months of its January 2023 public launch, and that the platform has generated over 100 years of audio.

33.     ElevenLabs has released multiple generations of foundational voice synthesis models: Eleven English v1; Eleven Multilingual v1 and v2 (supporting thirty-two or more languages); Eleven Flash v2 and v2.5 (low-latency models

16

optimized for interactive applications); Eleven Turbo v2 and v2.5 (speed-optimized for real-time applications); and Eleven v3 (announced June 2025, described by ElevenLabs as "the most expressive Text to Speech model"). Each generation represents additional training and refinement of the underlying voice models.

34.     Built on these foundational models, ElevenLabs offers a full suite of commercial voice products: text-to-speech in over seventy languages; Instant Voice Cloning from as little as thirty seconds of source audio; Professional Voice Cloning that ElevenLabs describes as producing "a near-perfect clone" of the source speaker; AI Dubbing that preserves a speaker's original voice characteristics across languages; Voice Design; Conversational AI; music generation; and audiobook generation and distribution to Spotify, InAudio, and ElevenReader. Every one of these products depends on the voice characteristics its underlying foundational models acquired during training.

35.     In November 2025, ElevenLabs launched the Iconic Marketplace, a consent- and licensing-based program through which the rights-holders of named celebrity voices — including living celebrities such as Michael Caine and Matthew McConaughey, and the estates of Maya Angelou and Alan Turing — must affirmatively approve any commercial use of their voices before ElevenLabs generates audio output using them. ElevenLabs built the operational infrastructure required to identify specific speakers within its foundational voice synthesis models, track commercial use against named

17

rights-holders, share revenue with those rights-holders, and enforce consent at the model-output level.

36.    ElevenLabs maintains a separate consent regime for platform users who upload their own voice data to ElevenLabs' platform; these users must accept ElevenLabs' Terms of Service before ElevenLabs processes their voice data.

37.    ElevenLabs has not extended either regime or any equivalent process to the non-user training data subjects whose voice recordings were ingested without their knowledge in the development of the foundational models on which both consent regimes depend.

*Voice Synthesis Technology and the Extraction of Voiceprints*

38.    A voiceprint is a computational representation of the acoustic features that distinguish a person's voice. A person's voice is shaped by the specific physiology of the vocal tract, larynx, oral and nasal resonators, and respiratory system, and is further refined by speech patterns developed over a lifetime, including accent, cadence, intonation, rhythm, and articulation. These traits are biologically unique to the individual. Once extracted from a speaker's recordings, a voiceprint can be embedded in or operationalized within an AI system, enabling the system to generate speech that replicates the speaker's voice characteristics indefinitely.

39.    AI voice synthesis works by training neural networks on large quantities of recorded human speech. During training, the network identifies the acoustic features that distinguish individual voices from one another —

18

pitch, timbre, resonance, accent, cadence, articulation, and dynamics of emotional expression — and encodes those features as mathematical representations stored in the parameters of the trained model. The same parameters are then used to generate new speech that exhibits the acoustic features the model learned during training.

40. The training process necessarily extracts and operationalizes speaker-specific representations from the input recordings. Whether those representations take the form of explicit speaker embeddings extracted from each training recording, learned speaker-encoder networks that generate speaker representations on demand, latent speaker spaces encoded across the training corpus, or speaker information distributed across model parameters, the pipeline extracts and operationalizes the speaker-distinguishing biometric features of the voices it ingests, in a form the AI system uses to distinguish, model, and replicate individual voices.

41. BIPA defines "biometric identifier" to include a "voiceprint" and defines "biometric information" as "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. The speaker representations ElevenLabs extracts during training, and any representations operationalized through ElevenLabs' models that encode the speaker-distinguishing acoustic features of individual speakers, fall within BIPA's scope — whether classified as voiceprints, as biometric information derived from

19

voiceprints, or as both. The label the technology industry uses does not determine the statutory classification. The function of the data does.

42.    ElevenLabs' documentation confirms that its voice processing performs this extraction. ElevenLabs' CCPA Notice at Collection states that its "proprietary, AI-based technologies analyze your speech characteristics to formulate a distinct voice model of your vocal traits." ElevenLabs' Professional Voice Cloning documentation describes the cloning process as "highly accurate in cloning the samples used for its training" and as creating "a near-perfect clone of what it hears, including all the intricacies and characteristics of that voice." ElevenLabs' Privacy Policy acknowledges that "applicable law may define [users'] Voice Data as biometric data," and its EU–US Data Privacy Framework Policy states that "voice data … may comprise biometric data under applicable data protection laws."[1]

43.    A commercial customer of ElevenLabs has independently characterized the voice processing ElevenLabs performs as biometric. I-CAR, a commercial customer of ElevenLabs with a privacy-compliance interest in classifying its operations, has published a Biometric Technology Policy describing the voice processing performed through ElevenLabs' technology as follows: "The voiceprint is captured using existing recordings of a voice. Once

---

[1] ElevenLabs CCPA Notice at Collection, https://elevenlabs.io/ccpa-notice-at-collection (last visited on May 11, 2026; Professional Voice Cloning, ElevenLabs Documentation, https://elevenlabs.io/docs/eleven-creative/voices/voice-cloning/professional-voice-cloning (last visited on May 11, 2026); ElevenLabs Privacy Policy, https://elevenlabs.io/privacy-policy (last visited on May 11, 2026); ElevenLabs EU-US Data Privacy Framework Policy, https://elevenlabs.io/eu-us-data-privacy-framework-policy (last visited on May 11, 2026).

the recording is uploaded, speech synthesis artificial intelligence will create or replicate a voice using a mathematical algorithm." I-CAR identified the process as involving "biometric technology" and used the statutory term "voiceprint."[2]

44.    The biometric processing ElevenLabs performs during foundational-model training is, on information and belief, the same category of processing it performs in its consumer-facing voice cloning features — Instant Voice Cloning and Professional Voice Cloning.

45.    This belief is grounded in three independent sources. *First,* the architecture of modern multi-speaker neural text-to-speech systems, such as those operated by ElevenLabs, necessarily involves the extraction and operationalization of speaker-distinguishing features at training time. The training pipeline is where voiceprints and biometric information are first extracted at the largest scale and from the broadest set of voice recordings; the consumer-facing cloning features are applications of the capabilities it created.

46.    *Second,* ElevenLabs' documentation describes the biometric processing it performs in language that is equally applicable to training and to cloning, as quoted at ¶ 42.

47.    *Third,* in prior litigation against ElevenLabs, two professional voice actors alleged precisely this equivalence: that ElevenLabs created two of its default synthetic voices, "Bella" and "Adam," by training on the plaintiffs'

---

[2] I-CAR, Policy on Biometric Technology, https://info.i-car.com/about-us/governance/policies/biometric-technology (last visited on May 11, 2026).

audiobook narrations. *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024).

*ElevenLabs' Training Data and the Common Bases
for the Inference That Plaintiffs' Recordings Were Used*

48. Plaintiffs have identified no public model card, data sheet, training data manifest, transparency report, or other public disclosure from ElevenLabs that identifies the sources, scale, or provenance of the voice data used to train its foundational voice synthesis models.

49. ElevenLabs' silence about its voice training data is made all the more conspicuous by its treatment of its music model. In August 2025, ElevenLabs launched Eleven Music and explicitly stated that its music model was "trained on licensed data and suitable for commercial use," and announced partnerships with Merlin and Kobalt for licensed music content. ElevenLabs has made no equivalent representation about licensed sourcing for its foundational voice synthesis models, on which its primary commercial products are built.

50. No public mechanism exists for individuals whose voices were ingested into ElevenLabs' training data without their knowledge to discover whether their voices were used, opt out of, or seek removal of their biometric data from ElevenLabs' training datasets, foundational models, or downstream commercial products. ElevenLabs has not made any such mechanism available to Plaintiffs or, on information and belief, to any other non-user training-data subject.

22

51.     On information and belief, ElevenLabs sourced a substantial portion of the audio used to train its foundational voice synthesis models by accessing publicly distributed long-form audio recordings of identifiable individual speakers on third-party platforms. The *Vacker* allegations, for example, describe ElevenLabs' sourcing of unconsented audiobook narrations from publicly distributed audio.

52.     On information and belief, additional categories of publicly distributed audio — including podcasts, broadcast journalism, audio drama, and other narrative voice content distributed through major hosting and discovery platforms — were similarly used. ElevenLabs' data acquisition for foundational voice-model training was not limited to pre-packaged, third-party, anonymized datasets. The specific platforms, scraping or licensing methods, and dataset compositions used by ElevenLabs are within ElevenLabs' exclusive possession and control.

53.     The platforms on which Plaintiffs' recordings are available — including Apple Podcasts, Spotify, Audible, iHeartRadio, Amazon Music, YouTube, Google Play Books (until that service shut down in 2024), Libro.fm, Stitcher, and the WBEZ/NPR, Media Burn, and NBC Chicago digital archives, among others — host creator profiles, channel and artist descriptions, and content metadata that publicly identify the creator's name and, in many cases, the creator's geographic affiliation. With respect to Plaintiffs specifically, the platforms on which Plaintiffs' recordings are available displayed Plaintiffs'

identities by name and publicly identified the recordings' association with Illinois at all times relevant to ElevenLabs' alleged data acquisition.

54. On information and belief, Plaintiffs' voice recordings were among the audio ElevenLabs used to train its foundational voice synthesis models. Voiceprints and biometric information derived from Plaintiffs' vocal performances are embedded in or operationalized through those models. The specific facts confirming whether and when any individual Plaintiff's recordings entered ElevenLabs' training pipeline — including ElevenLabs' training-data manifests, source-platform records, and model-internal provenance records — are within ElevenLabs' exclusive possession and control. Plaintiffs allege these facts on information and belief based on the following six common bases, each of which applies to every Plaintiff:

(a) *Technical scale.* As alleged in ¶¶ 38–47, foundational multi-speaker voice synthesis models of the type ElevenLabs commercially offers are built by extracting speaker-specific representations from input audio recordings — the same category of biometric processing ElevenLabs describes in its Privacy Policy and CCPA Notice as analyzing "speech characteristics to formulate a distinct voice model of [the speaker's] vocal traits." On information and belief, the production of voice models with the multilingual range and commercial quality ElevenLabs offers — generating speech in over seventy languages and used, ElevenLabs reports, by employees at over seventy-five percent of Fortune 500 companies — required ingestion of large volumes of long-form, single-speaker audio featuring identifiable individual speakers.

(b)    *Plaintiffs' voice content matches the training-data profile.* Each Plaintiff's voice work matches several material dimensions of the audio that has been alleged in prior litigation against ElevenLabs to be training material for ElevenLabs' foundational voice models: a single, consistent speaker across long-form recordings; professionally produced studio-quality audio; many hours of content across broadcasts, podcast episodes, interviews, narrations, and other recorded vocal performances, providing the volume and consistency ElevenLabs' documentation identifies as optimal for voice model training; public accessibility on major distribution platforms; and professional recognition that would render the work a high-value and readily identifiable source of training audio.

(c)    *Public availability through ingested channels.* Each Plaintiff's voice work has been continuously publicly available, through one or more of the categories of platforms that have been alleged in *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024), as sources from which ElevenLabs is alleged to have acquired audio recordings for use in training its foundational voice models, for periods preceding ElevenLabs' January 2023 public launch and continuing thereafter, with publicly visible metadata identifying each Plaintiff by name and identifying the geographic origin of the content as Illinois.

(d)    *ElevenLabs' acquisition practices.* As alleged in ¶ 51, ElevenLabs' data acquisition for foundational voice-model training included ingesting publicly distributed long-form audio recordings of identifiable speakers.

25

ElevenLabs' subsequent conduct — the rapid deployment of verification-based safeguards within days of its January 2023 public launch, the *Vacker* settlement, and the November 2025 launch of the Iconic Marketplace as a consent-based licensing framework for celebrities — reflects the company's recognition that its training-data acquisition practices lacked consent infrastructure for ordinary speakers whose recordings were used to train its foundational models.

(e)     *Non-disclosure.* As alleged in ¶ 48, ElevenLabs has not published any model card, data sheet, training-data manifest, or transparency report disclosing the sources, scale, or provenance of the voice data used to train its foundational voice synthesis models. The identities of the speakers whose voices were ingested, the categories of sources from which those recordings were obtained, and the technical parameters of the ingestion pipeline are facts within ElevenLabs' exclusive possession and control.

(f)     *Identifiably Illinois-origin material.* ElevenLabs' acquisition of Plaintiffs' recordings involved content that was identifiably Illinois-produced and that, as alleged in ¶¶ 53, 61, was publicly affiliated with Illinois at the time of acquisition. The resulting voiceprints are commercially exploited in connection with ongoing business conducted in Illinois. The Illinois affiliation of each Plaintiff and each Plaintiff's recordings was knowable to ElevenLabs from publicly visible platform metadata at the time of acquisition and remains knowable today.

*ElevenLabs' Privacy Practices and BIPA Non-Compliance*

55.     ElevenLabs' privacy disclosures are directed at users of its platform. By their terms and operation, those disclosures do not provide, and cannot provide, notice or consent for non-users like Plaintiffs, whose voices were ingested from third-party sources without any direct interaction with ElevenLabs.

56.     ElevenLabs' Privacy Policy uses hedging language regarding biometric data, stating that "applicable law may define [users'] Voice Data as biometric data." This language reflects ElevenLabs' acknowledgment that its voice processing may implicate biometric privacy law, including BIPA. ElevenLabs proceeded with the alleged collection and processing of voice data notwithstanding that acknowledgment, and without implementing the notice, consent, retention-policy, and other compliance measures BIPA requires.

57.     ElevenLabs' Privacy Policy is, in any event, facially inapplicable to Plaintiffs. ElevenLabs' biometric retention provision states: "We will retain your biometric data until it is no longer needed for the purposes in which it was collected, or after 3 years of the termination of our relationship with you, whichever is sooner." This provision is facially inapplicable to Plaintiffs, who had no "relationship" with ElevenLabs to terminate. No retention or destruction policy applicable to non-user training-data subjects has been publicly identified. ElevenLabs' consent mechanism for platform users consists of general Terms of Service acceptance and does not provide the specific notice of purpose, duration, and biometric-data implications, or the informed written

27

release, that BIPA § 15(b) requires. With respect to Plaintiffs specifically, no consent of any kind was obtained.

58.     ElevenLabs' Terms of Service claim "perpetual, irrevocable, royalty-free, worldwide" rights to models derived from voice data, including after deletion of the underlying source recordings. The biometric characteristics extracted from voice recordings during model training are, on information and belief, embedded in or operationalized through model parameters and persist in ElevenLabs' commercial models notwithstanding any deletion of the underlying source recordings. ElevenLabs has not publicly identified any process for the destruction of biometric data embedded in or derived from its trained models.

59.     ElevenLabs' Terms of Service further grant ElevenLabs a sublicensable license to user-submitted Voice Data "through multiple tiers" of recipients, permitting dissemination to other recipients without specific consent or contractual safeguards.

60.     Voice Cloning workflows are excluded from ElevenLabs' Zero Retention Mode, which is, in any event, available only to Enterprise-tier customers.

*The Biometric Data Was Generated in Illinois*

61.     The voice recordings from which ElevenLabs is alleged to have extracted Plaintiffs' voiceprints are of Illinois origin in every material respect. Plaintiffs' voices were produced by Plaintiffs while they were physically present in Illinois. The recordings embodying those voices were created in Illinois and published from Illinois to publicly accessible platforms on which Plaintiffs'

name and Illinois affiliation were publicly visible at the time of ElevenLabs' acquisition. The biometric data ElevenLabs extracted from those recordings is, accordingly, Illinois-origin biometric data, regardless of where any subsequent computational processing occurred.

*BIPA's Duty Runs to the Subject of the Biometric Data*

62.     BIPA's notice and consent obligations under § 15(b) are duties that run to the subject whose biometric data is collected. The statute requires that the collecting entity inform "the subject" in writing and receive "a written release executed by the subject" before collection. 740 ILCS 14/15(b). The duty is owed to the subject, not to the location of the collecting entity's computational infrastructure. The same is true of BIPA's retention obligations under § 15(a), profiting prohibitions under § 15(c), dissemination prohibitions under § 15(d), and reasonable-care obligations under § 15(e), each of which protects the persons from whom biometric data is taken. The subjects of the biometric data at issue in this Complaint, Plaintiffs and the Class, are persons whose voices and recordings were generated in Illinois, as alleged in ¶ 61.

63.     ElevenLabs' continuing possession of voiceprints and biometric information generated in Illinois likewise runs afoul of obligations BIPA imposes for the benefit of the subjects of that data. ElevenLabs has not made publicly available a written retention schedule and destruction policy compliant with 740 ILCS 14/15(a) covering biometric data obtained from non-user training-data sources, as alleged in ¶¶ 50, 57, and has provided no mechanism by which Plaintiffs or any other non-user training-data subject may seek

29

removal or destruction of their biometric data, as alleged in ¶ 50. ElevenLabs'

commercial agreements assert perpetual rights over voice data and over models

derived from voice data, as alleged in ¶ 58, with the consequence that the

biometric data of Illinois-origin training subjects is, on information and belief,

retained indefinitely. These continuing failures are owed to Illinois subjects

whose biometric data was generated in Illinois.

*Commercial Substitution and the Integrated Commercial Chain*

64. ElevenLabs' voice synthesis products directly serve or threaten the

professional markets in which Plaintiffs and Class members earn their

livelihoods, including audiobook narration, voice acting, podcast hosting and

narration, film and television dubbing, advertising voiceover, broadcast and

audio journalism, and other markets for professional voice work. The voice

quality, expressiveness, speaker similarity, and multilingual capability that

ElevenLabs sells through its subscription tiers, API and developer products,

Iconic Marketplace transactions, audiobook generation products,

Conversational AI and voice agent products, and AI Dubbing and Voice Design

products are not separable from the voiceprints extracted during training; they

are the commercial expression of those voiceprints. At this point, the biometric

data and the product are the same thing.

65. ElevenLabs monetizes Plaintiffs' voiceprints and biometric

information through six integrated commercial channels:

(a) *Subscription tiers.* ElevenLabs offers tiered subscription plans —

free, Starter, Creator, Pro, Scale, and Enterprise — to consumers and

businesses, with Pro and higher tiers granting commercial-use rights to generated audio. Free and Growth-tier users have training data use turned on by default; opt-out requires a manual toggle and applies only prospectively.

(b)      *API usage and developer integrations.* ElevenLabs charges customers per character of generated audio or per minute of generated speech through its API, with pricing tiered by voice quality and capability. Each API call generates audio whose acoustic features derive from the voiceprints encoded in ElevenLabs' foundational voice synthesis models.

(c)      *The Iconic Marketplace.* As alleged in ¶ 35, ElevenLabs operates the Iconic Marketplace as a consent- and licensing-based program through which third parties pay ElevenLabs for the right to generate audio using specific licensed voiceprints, with revenue shared between ElevenLabs and the rights-holders. The Iconic Marketplace, by its operation, establishes that ElevenLabs treats voiceprints as transactable commercial assets.

(d)      *Audiobook generation and distribution.* ElevenLabs offers AI-generated audiobook creation with direct distribution to Spotify, InAudio, and ElevenReader, including revenue-share arrangements with audiobook publishers and authors. Professional audiobook narration costs $250 to $400 per finished hour; a ten-hour novel costs $3,000 to $4,000 to narrate by a human professional. ElevenLabs' Pro plan, at $99 per month, can generate an entire audiobook in several hours using AI voice technology.

(e)      *Conversational AI, voice agents, and enterprise contracts.* ElevenLabs offers Conversational AI and voice agent products through

31

Enterprise contracts that provide real-time voice synthesis for customer service, virtual assistants, telephony applications, and other enterprise use cases. Each Conversational AI session generates audio whose acoustic features derive from the foundational voice synthesis models.

(f)     *AI Dubbing, Voice Design, Voice Cloning, and other downstream products.* ElevenLabs offers AI Dubbing (which preserves a speaker's original voice characteristics across languages), Voice Design (which generates new voices based on text descriptions), Instant and Professional Voice Cloning (which produce voice clones from short source-audio samples), and other commercial voice products whose commercial value is constituted by the voiceprints encoded in the underlying foundational models.

66.     On information and belief, the technology ElevenLabs built using Plaintiffs' voiceprints and biometric information now directly competes with Plaintiffs in the markets in which Plaintiffs and Class members earn their livelihoods. ElevenLabs markets AI Dubbing and audiobook generation as commercial substitutes for professional audiobook narration; Conversational AI as a substitute for professional voice actors and voiceover artists; and the underlying text-to-speech and Voice Cloning capabilities as substitutes for the full range of professional voice work in which Plaintiffs and Class members are active. ElevenLabs offers these products to commercial customers at a fraction of the cost of hiring the human professionals whose unconsented recordings made the synthesis possible. Each commercial transaction in those products is

32

the monetization of the biometric extraction at the beginning of the commercial chain.

*Named Plaintiffs' Individual Experiences*

*Carol Marin*

67.     Carol Marin is one of the most decorated broadcast journalists in American television history. Her voice-based and oral journalism work — spanning five decades of on-air television and radio reporting from Chicago — comprises broadcast investigative reporting, documentary narration, live debate moderation, in-depth interviewing, and live news anchoring. Marin's work has aired on WMAQ-TV (NBC 5 Chicago), CBS News (*60 Minutes*, *60 Minutes II*, and *CBS Evening News*), WTTW (*Chicago Tonight*), CNN, and the Discovery Channel. Her career has been recognized with three George Foster Peabody Awards (including a Personal Peabody), two Alfred I. duPont–Columbia University Awards, two National Emmy Awards, at least fifteen Regional Emmy Awards, the George Polk Award, the Gracie Award, the Sigma Delta Chi Ethics in Journalism Award, induction into the Chicago Journalism Hall of Fame, and, in 2025, the Order of Lincoln, the State of Illinois's highest civilian honor. Marin's voice-based journalism work was recorded in Illinois while she was physically present in Illinois.

68.     A substantial archive of Marin's on-air broadcast journalism is publicly available through the Media Burn Archive (mediaburn.org), a Chicago-based nonprofit digital archive that preserves her broadcast investigative reporting, documentary work, and on-air interviews. Marin's work is also

publicly accessible through the WTTW digital archive (news.wttw.com), the NBC Chicago digital archive (nbcchicago.com), and YouTube, where her Peabody acceptance speeches, debate moderation, and archived broadcast segments are publicly available. Marin's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Marin by name and identifying her work as Chicago-produced, for years preceding ElevenLabs' January 2023 public launch.

69.     On information and belief, Marin's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Marin's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Marin because her body of work, spanning five decades of broadcast journalism and totaling thousands of hours of single-speaker, studio-quality audio, represents an unusually high-value and readily identifiable source of long-form professional training audio of the kind ElevenLabs' foundational models require.

70.     Marin has never interacted with ElevenLabs. She has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. She has never been informed that ElevenLabs collected, captured, or otherwise obtained her voiceprint or any biometric information derived from her voice. She has

never consented, in writing, electronically, or otherwise, to any such collection. She was never given the opportunity.

71. Marin has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Marin's legally protected privacy interest in her own biometric identifiers by extracting voiceprints and biometric information without notice or consent, and deprived her of the right BIPA guarantees to make an informed decision about the collection and use of her biometric data. ElevenLabs retains those voiceprints in its commercial models and continues to profit from them; Marin's biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems. Although Marin is now retired from full-time broadcast journalism, the technology ElevenLabs built using her voice now operates in the markets where her colleagues continue to work: ElevenLabs' AI Dubbing and Voice Design products are marketed to broadcast and documentary producers as commercial substitutes for the kind of broadcast investigative narration and documentary voice work Marin spent her career producing. Marin's voice has, in addition, public-record value as an instrument of journalism — a value ElevenLabs' commercial exploitation diminishes through commodification and through the dilution of authentic broadcast voice in the audio marketplace.

*Yohance Lacour*

72. Yohance Lacour is a journalist, audio storyteller, writer, playwright, and entrepreneur from the South Side of Chicago. He is the creator, host, writer, and lead reporter of the seven-part investigative podcast *You Didn't*

35

*See Nothin'*, which revisits the 1997 hate-crime attack on Lenard Clark, tracks down key participants in the case a quarter-century later, and examines how the case and its aftermath shaped Lacour's own life. *You Didn't See Nothin'* was awarded the 2024 Pulitzer Prize for Audio Reporting and a 2024 Peabody Award, was named among Apple Podcasts' "100 Best Podcasts of All Time," and received nominations at the Signal Podcasting Awards and four nominations at the Black Podcasting Awards. Lacour is affiliated with the Invisible Institute, the Chicago-based nonprofit investigative journalism organization through which *You Didn't See Nothin'* was produced. Lacour's voice-based journalism and podcast work, including the entirety of *You Didn't See Nothin'*, was produced in Chicago while Lacour was physically present in Illinois.

73.     *You Didn't See Nothin'* is publicly available and distributed across major podcast and digital audio platforms, including Apple Podcasts, Spotify, iHeart Podcasts, YouTube, Amazon Music, and Overcast. The series has been continuously publicly available since its release, with metadata publicly identifying Lacour by name as the host and Chicago as the location of production. Lacour has appeared as a featured guest and interview subject on nationally distributed audio journalism programs discussing *You Didn't See Nothin'* and his work, including NPR's *Fresh Air* with Tonya Mosley, NPR's *All Things Considered* with Adrian Florido, the Canadian Broadcasting Corporation's *Crime Story* with Kathleen Goldhar, and the Pulitzer Prize Board's *Pulitzer on the Road* podcast produced by Audacy's Pineapple Street

Studios. These interviews are publicly available across major public radio and podcast distribution platforms.

74. On information and belief, Lacour's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Lacour's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Lacour because *You Didn't See Nothin'* — awarded the 2024 Pulitzer Prize for Audio Reporting and recognized as one of the most acclaimed long-form investigative podcasts of its release year — has been continuously available across major podcast distribution platforms since its release, with metadata publicly identifying Lacour as the host and Chicago as the location of production, and with substantial public attention and critical recognition that would have rendered it a readily identifiable high-value source of training audio for a foundational voice synthesis model developer seeking long-form, narrative, single-speaker audio of the kind ElevenLabs' models depend on.

75. Lacour has never interacted with ElevenLabs. He has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. He has never been informed that ElevenLabs collected, captured, or otherwise obtained his voiceprint or any biometric information derived from his voice. He has never

consented, in writing, electronically, or otherwise, to any such collection. He was never given the opportunity.

76. Lacour has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Lacour's legally protected privacy interest in his own biometric identifiers and deprived him of the BIPA-guaranteed right to make an informed decision about the collection and use of his biometric data. The technology ElevenLabs built using Lacour's voice now operates directly in the markets where Lacour earns his living: ElevenLabs' AI-generated audiobook generation and podcast narration products, marketed by ElevenLabs as commercial substitutes for human podcast production, compete directly with the long-form investigative narrative audio journalism Lacour has spent his career developing. Lacour's distinctive voice — the instrument through which *You Didn't See Nothin'* delivered the storytelling that won the Pulitzer — is a professional asset whose commercial value ElevenLabs' unauthorized use diminishes through commodification, dilution, and the impairment of authentic-attribution premiums in the long-form narrative audio marketplace. His biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems.

### Alison Flowers

77. Alison Flowers is an investigative journalist, audio producer, and audio storyteller whose voice-based and oral journalism work has been recognized with the highest honors in the field. Flowers is the founder of Spiralbound, a Chicago-based production company operating at the

38

intersection of investigative journalism and immersive audio storytelling. Before founding Spiralbound, Flowers served as the Head of Production at the Invisible Institute, the Chicago-based nonprofit investigative journalism organization, where she built and led journalism production teams whose work received four nominations from the Pulitzer Prize board over a four-year period. Flowers produced and reported the seven-part investigative podcast *Somebody*, which premiered on March 31, 2020, and investigated the 2016 murder of Courtney Copeland; she served as a producer, on-air journalist, and narrator alongside host Shapearl Wells. *Somebody* was a finalist for the 2021 Pulitzer Prize for Audio Reporting and received the National Magazine Award (the "Ellie") for Podcasting, the Scripps Howard Award for Excellence in Radio/Podcast Coverage, the International Documentary Association's Best Audio Documentary, a National Headliner Award, a Gracie Award, and the 2020 Third Coast International Audio Festival Award for Best Serialized Story. *Somebody* was named to *Rolling Stone*'s list of "The 25 Best True-Crime Podcasts of All Time" and topped *Rolling Stone*'s "Best Podcasts of 2020" list; was ranked first on *The New York Times*'s list of true-crime podcasts at the intersection of race; ranked second on *The Atlantic*'s "The 50 Best Podcasts of 2020"; and reached the number two position among true crime podcasts on the Apple Podcasts chart. Flowers's voice-based journalism work was produced in Chicago, including through Spiralbound, while she was physically present in Illinois.

78.     *Somebody* is publicly available on Apple Podcasts, Spotify, iHeartRadio, YouTube, Stitcher, and other major podcast platforms; until that

service shut down in 2024, *Somebody* was also publicly available on Google Podcasts. Flowers's additional voice-based reporting on *Reveal* from the Center for Investigative Reporting, *The Heist* from the Center for Public Integrity, *Vox*, *Dateline NBC*, and *Democracy Now!* is continuously available on those programs' respective platforms, including Apple Podcasts, Spotify, and other major podcast distribution services. Flowers's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Flowers by name and identifying her work as Chicago-produced, for years preceding ElevenLabs' January 2023 public launch.

79. On information and belief, Flowers's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Flowers's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Flowers because *Somebody* — a 2021 Pulitzer Prize finalist that achieved unusual critical and listener recognition for long-form investigative narrative audio — has been continuously available across major podcast platforms with metadata publicly identifying Flowers as the producer-narrator and identifying the series as Chicago-produced, and because Flowers's reporting on *Reveal*, *The Heist*, *Vox*, *Dateline NBC*, and *Democracy Now!* extends the publicly available record of her single-speaker, studio-quality audio across multiple distribution platforms over a sustained period.

80.     Flowers has never interacted with ElevenLabs. She has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. She has never been informed that ElevenLabs collected, captured, or otherwise obtained her voiceprint or any biometric information derived from her voice. She has never consented, in writing, electronically, or otherwise, to any such collection. She was never given the opportunity.

81.     Flowers has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Flowers's legally protected privacy interest in her own biometric identifiers and deprived her of the BIPA-guaranteed right to make an informed decision about the collection and use of her biometric data. The technology ElevenLabs built using Flowers's voice now operates directly in the markets where Flowers earns her living and operates Spiralbound: ElevenLabs' AI-generated podcast generation, audiobook generation, AI Dubbing, and Conversational AI products are marketed by ElevenLabs as commercial substitutes for the long-form investigative narrative audio production work Flowers performs both for outside clients and through Spiralbound. The technology ElevenLabs built using Flowers's voice diminishes the commercial value of Flowers's distinctive voice and of the long-form audio production Flowers's career has been devoted to. Her biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems.

*Robin Amer*

82.     Robin Amer is a journalist, podcast creator, audio producer, and on-air host. Amer is the creator, host, narrator, and showrunner of *The City*, the critically acclaimed investigative podcast produced by USA Today; she served as on-air host and narrator for both seasons and conducted recorded interviews and field reporting throughout the series. *The City* peaked at No. 6 on the Apple Podcasts charts and was named Best Podcast of the Year by *The New Yorker*, *The New York Times*, *Quartz*, and Apple Podcasts, among other publications. Amer's contributions to the podcast *Gravy*, produced by the Southern Foodways Alliance, helped that program win the 2015 James Beard Award for Best Podcast. During three years at *The Washington Post*, Amer served as Senior Producer for Audio Features, editing enterprise and investigative audio for *Post Reports* and *Field Trip*, and was a winner or finalist for the Alfred I. duPont–Columbia University Award three consecutive years. Amer currently serves as Managing Editor of *Love + Radio*, where she has managed *Blood Memory*, a ten-part narrative series that won the Tribeca Festival Audio Storytelling prize for Best Independent Non-Fiction in June 2025 and was shortlisted for the Whickers Prize. Amer's voice-based and oral journalism work has been produced substantially in and from Chicago while she was physically present in Illinois; although a limited subset of her professional recordings has been created outside Illinois, the substantial majority of her voice work, and the resulting voiceprints derived from those recordings, originated from Illinois.

83.     *The City* is publicly available on Apple Podcasts, Spotify, iHeartRadio, and other major podcast distribution platforms. *Gravy* is publicly available on Apple Podcasts, Spotify, and other major podcast platforms. *Post Reports* and *Field Trip* are publicly available on Apple Podcasts, Spotify, YouTube, and other major platforms. *Love + Radio: Blood Memory* is publicly available on Apple Podcasts, Spotify, Amazon Music, and other major podcast distribution platforms. Amer's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Amer by name and identifying her work substantially as Chicago-produced, for years preceding ElevenLabs' January 2023 public launch.

84.     On information and belief, Amer's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Amer's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Amer because her body of work as creator, host, and showrunner of *The City* — which peaked at No. 6 on the Apple Podcasts charts and won duPont-Columbia recognition — together with her contributions to *Gravy*, *Post Reports*, *Field Trip*, and *Love + Radio: Blood Memory*, comprises hundreds of hours of single-speaker, studio-quality audio publicly available across major distribution platforms for years preceding ElevenLabs' January 2023 public launch.

43

85.     Amer has never interacted with ElevenLabs. She has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. She has never been informed that ElevenLabs collected, captured, or otherwise obtained her voiceprint or any biometric information derived from her voice. She has never consented, in writing, electronically, or otherwise, to any such collection. She was never given the opportunity.

86.     Amer has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Amer's legally protected privacy interest in her own biometric identifiers and deprived her of the BIPA-guaranteed right to make an informed decision about the collection and use of her biometric data. The technology ElevenLabs built using Amer's voice now operates directly in the markets where Amer earns her living: ElevenLabs' AI-generated podcast generation, AI Dubbing, and Conversational AI products are marketed by ElevenLabs as commercial substitutes for the kind of long-form narrative podcast hosting, narration, and showrunning that has defined Amer's career, including in her current role as Managing Editor of *Love + Radio*. The technology ElevenLabs built using Amer's voice diminishes the commercial value of authentic human podcast hosting and narration in the markets in which Amer participates. Her biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems.

*Philip Rogers*

87.     Philip Rogers is an established, nationally recognized broadcast journalist whose voice-based and oral journalism work spans more than four decades from Chicago. Rogers's career, conducted primarily at WBBM Newsradio (CBS) and WMAQ-TV (NBC 5 Chicago), encompasses on-air radio reporting, on-air television reporting and anchoring, and live broadcast coverage from conflict zones, disaster scenes, the Olympic Games, and major national and international events. His career has been recognized with a National Emmy Award, the Edward R. Murrow Award, five Associated Press Best Reporter honors, multiple Peter Lisagor Awards from the Chicago Headline Club, and additional Emmy Awards. Rogers's voice-based journalism work was recorded in Illinois while he was physically present in Illinois.

88.     A substantial archive of Rogers's on-air broadcast journalism is publicly available on the NBC Chicago digital platform at nbcchicago.com, where his on-air reports, investigative segments, and broadcast news stories are archived and searchable, and is also publicly available on WBBM Newsradio's archive infrastructure and on YouTube, where his Illinois News Broadcasters Association career-retrospective interview and additional broadcast segments are publicly available. Rogers's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Rogers by name and identifying his work as Chicago-produced, for years preceding ElevenLabs' January 2023 public launch.

45

89.     On information and belief, Rogers's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Rogers's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Rogers because his more-than-four-decade on-air broadcast journalism — comprising thousands of hours of single-speaker, studio-quality audio publicly available through the NBC Chicago digital archive, WBBM Newsradio archive infrastructure, and YouTube — represents an unusually high-value and readily identifiable source of long-form professional training audio of the kind ElevenLabs' foundational models require.

90.     Rogers has never interacted with ElevenLabs. He has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. He has never been informed that ElevenLabs collected, captured, or otherwise obtained his voiceprint or any biometric information derived from his voice. He has never consented, in writing, electronically, or otherwise, to any such collection. He was never given the opportunity.

91.     Rogers has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Rogers's legally protected privacy interest in his own biometric identifiers and deprived him of the BIPA-guaranteed right to make an informed decision about the collection and use of

46

his biometric data. Although Rogers has retired from full-time broadcast journalism, the technology ElevenLabs built using his voice now operates in the markets where his colleagues continue to work: ElevenLabs' AI Dubbing, Conversational AI, and text-to-speech products are marketed by ElevenLabs as commercial substitutes for broadcast news anchoring, on-air reporting, and other live and recorded broadcast voice applications. Rogers's distinctive on-air voice, developed across four decades of broadcast journalism, retains independent professional and reputational value that ElevenLabs' commercial exploitation diminishes through commodification and dilution. His biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems.

*Lindsey Dorcus*

92.     Lindsey Dorcus is a prolific professional audiobook narrator who has recorded over two hundred audiobooks from her professional home recording studio in Chicago. Dorcus has narrated for many of the largest and most prominent publishers in the English-language audiobook industry, including Penguin Random House, Simon & Schuster, Macmillan, Hachette, Disney Hyperion, Audible Studios, Blackstone Publishing, Tantor Media, Harper Audio, Podium, and Scribd. Dorcus's audiobook narration work spans numerous genres, with particular emphasis on young adult fiction, science fiction and fantasy, romance, mystery and thriller, and works featuring LGBTQ+ themes and characters. Her career has been recognized with a Society of Voice Arts and Sciences ("SOVAS") Voice Arts Award in 2020 (as part of the

full-cast ensemble for the audiobook anthology *Wild Monsters Dance About: Stories from an Unruly Mind*) and the Independent Audiobook Award in 2021 for LGBTQ+ audiobook narration. Industry publications have published favorable reviews of her narration; *AudioFile Magazine* (now Kirkus Reviews) has described her performances as "silky," "joyful," and capable of "drawing listeners in with the haunting cadence of her voice." Dorcus possesses a professionally recognized range of accents and dialects, including General American, British (Received Pronunciation, Estuary, and Cockney), Scottish, Irish (Dublin and Northern Irish), French, American Southern, and Greek for main characters and narration, and New England, New York, German, Indian, and Russian for supporting characters — a range itself a professional asset reflecting years of training and practical performance experience. Dorcus also performs voice acting in fiction podcasts, performing dramatic voice work for serialized audio storytelling distributed through major podcast platforms. All of Dorcus's audiobook narration work has been recorded at studios, including her home recording studio, in Chicago, while Dorcus was physically present in Illinois.

93.    Dorcus's audiobook narration is publicly available and distributed across all major audiobook and digital audio platforms, including Audible, Apple Books, Spotify, Libro.fm, Chirp, Scribd/Everand, and other major audiobook retailers and subscription services; until that service shut down in 2024, Dorcus's audiobooks were also publicly available on Google Play Books. Dorcus's complete catalog of narrated titles is searchable and accessible on

48

Audible.com and other major audiobook platforms. Dorcus's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Dorcus by name as the narrator, for years preceding ElevenLabs' January 2023 public launch.

94.     On information and belief, Dorcus's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Dorcus's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Dorcus because her audiobook catalog — exceeding two hundred commercially released narrations distributed by every major U.S. audiobook publisher — represents precisely the long-form, single-speaker, studio-quality audio that ElevenLabs' documentation identifies as optimal for voice-model training, and is continuously distributed across Audible, Libro.fm, Spotify, Apple Books, and other major platforms with metadata publicly identifying Dorcus as the narrator. The *Vacker v. Eleven Labs* allegations specifically concerned ElevenLabs' use of unconsented audiobook narrations to create default voices; Dorcus's audiobook work shares the same source category. Dorcus's accent and dialect range — twelve distinct accents across main and supporting characters — is itself a distinctive and high-value category of training material for a multilingual voice synthesis system supporting more than seventy languages.

95. Dorcus has never interacted with ElevenLabs. She has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. She has never been informed that ElevenLabs collected, captured, or otherwise obtained her voiceprint or any biometric information derived from her voice. She has never consented, in writing, electronically, or otherwise, to any such collection. She was never given the opportunity.

96. Dorcus has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Dorcus's legally protected privacy interest in her own biometric identifiers and deprived her of the BIPA-guaranteed right to make an informed decision about the collection and use of her biometric data. The technology ElevenLabs built using Dorcus's voice now operates directly in the precise market where Dorcus earns her living: ElevenLabs offers an AI-generated audiobook generation product, with direct distribution to Spotify, InAudio, and ElevenReader, that is marketed by ElevenLabs as a commercial substitute for professional audiobook narration of exactly the kind Dorcus produces, at a small fraction of the cost. Traditional audiobook narration costs $250 to $400 per finished hour; ElevenLabs' Pro plan, at $99 per month, can generate an entire AI-narrated audiobook in several hours. Each AI-generated audiobook ElevenLabs' product distributes is, on information and belief, generated by a foundational model whose acoustic capabilities derive from voiceprints extracted during training — including, on information and belief, from Dorcus's catalog. Dorcus's biometric data was

50

taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems; the displacement of her professional market by the very products built on her voice represents direct, ongoing, and quantifiable economic harm.

*Victoria Nassif*

97.     Victoria Nassif is a first-generation Lebanese-Palestinian American actor, audiobook narrator, voiceover artist, and intimacy director whose work centers on her voice and physical performance. Nassif is a trained mezzo-soprano singer. Her audiobook narration work has been commercially released by Penguin Random House (Random House Audio), Hachette Book Group (Little, Brown Young Readers), and Simon & Schuster. Notable narrations include *The Next New Syrian Girl* by Ream Shukairy (Hachette/Little, Brown Young Readers), for which Nassif served as the solo narrator performing multiple characters with authentic Levantine Arabic accents; *The Skin and Its Girl* by Sarah Cypher (Random House Audio), a novel featuring a queer Palestinian American protagonist, shortlisted for the Ursula K. Le Guin Prize and named a *Them* Best Book of the Year; *Gulf* by Mo Ogrodnik (Simon & Schuster); *The Jasad Crown* by Sara Hashem; and *Every Moment is a Life*, a bilingual Arabic-English anthology compiled by Susan Abulhawa featuring stories from Palestinian writers, among others. Nassif has performed on-camera in broadcast television, including in multiple episodes of NBC's *Chicago PD* (Season 12), and has appeared in nationally broadcast commercials. Nassif possesses a professionally recognized range of accents and dialects, including

General American, British (Received Pronunciation and Cockney), Persian, Arabic (Levantine dialect), and American Southern. As a first-generation Lebanese-Palestinian American who speaks basic Arabic, Nassif brings native cultural and linguistic authenticity to her narration of works featuring Middle Eastern, Arab, and Palestinian American characters and settings — a distinctive market position in the audiobook narration industry. Nassif's voice-based work was produced primarily in Illinois while she was physically present in Illinois.

98.     Nassif's audiobook narration is publicly available and distributed across major audiobook and digital audio platforms, including Audible, Apple Books, Spotify, and Libro.fm, and other major audiobook retailers and subscription services. Her on-camera work on NBC's *Chicago PD* is publicly available through NBC's broadcast distribution and digital streaming platforms. Nassif's recordings have been continuously publicly available through these platforms, with metadata publicly identifying Nassif by name as the narrator or performer, for periods preceding ElevenLabs' January 2023 public launch and continuing thereafter.

99.     On information and belief, Nassif's voice recordings were among the audio ElevenLabs ingested to train its foundational voice synthesis models, and voiceprints and biometric information derived from Nassif's vocal performances are embedded in or operationalized through those models. The six common bases for this allegation are set forth at ¶ 54(a)–(f) and are incorporated by reference. Those bases apply with particular force to Nassif

52

because her audiobook catalog — commercially released by Penguin Random House, Hachette, and Simon & Schuster — represents the long-form, single-speaker, studio-quality audio that ElevenLabs' documentation identifies as optimal for voice-model training, and because her authentic Levantine Arabic-accented narrations of works by Arab and Palestinian American authors are a distinctive and readily identifiable category of voice content particularly valuable to a multilingual voice synthesis system supporting more than seventy languages. The *Vacker v. Eleven Labs* allegations specifically concerned ElevenLabs' use of unconsented audiobook narrations to create default voices; Nassif's audiobook work shares the same source category.

100.  Nassif has never interacted with ElevenLabs. She has never uploaded a voice recording to ElevenLabs' platform, accepted ElevenLabs' Terms of Service, or received any communication from ElevenLabs. She has never been informed that ElevenLabs collected, captured, or otherwise obtained her voiceprint or any biometric information derived from her voice. She has never consented, in writing, electronically, or otherwise, to any such collection. She was never given the opportunity.

101.  Nassif has suffered concrete and particularized injuries from ElevenLabs' conduct. ElevenLabs invaded Nassif's legally protected privacy interest in her own biometric identifiers and deprived her of the BIPA-guaranteed right to make an informed decision about the collection and use of her biometric data. The technology ElevenLabs built using Nassif's voice now operates directly in the markets where Nassif earns her living and in the niche

53

where her distinctive market position is most acute: ElevenLabs' AI-generated audiobook generation, AI Dubbing, and multilingual text-to-speech products are marketed by ElevenLabs as commercial substitutes for human audiobook narration and multilingual voice performance, including in the Arabic-accented and Levantine narration market in which Nassif holds her distinctive professional position. The cultural and linguistic authenticity Nassif brings to her narration of works by Arab and Palestinian American authors is itself the basis of her distinctive market position; ElevenLabs' multilingual voice synthesis products purport to deliver that authenticity through synthetic means, at a fraction of the cost of hiring Nassif or other authentic-voice narrators. Her biometric data was taken without authorization, cannot be replaced, and remains in ElevenLabs' commercial systems; the displacement of her authentic-voice niche by AI-generated multilingual voice synthesis represents direct, ongoing, and quantifiable economic harm.

*ElevenLabs Acted Willfully and Recklessly*

102.    ElevenLabs' collection, retention, commercial exploitation, and dissemination of Plaintiffs' voiceprints and biometric information without notice or consent were not the result of inadvertence or unfamiliarity with BIPA. ElevenLabs acted with knowledge of, or at a minimum, reckless disregard for, its obligations under Illinois law.

*ElevenLabs knew its obligations under BIPA*

103.    By the time ElevenLabs publicly released its beta voice platform in January 2023, BIPA had been Illinois law for more than fourteen years and had

54

produced some of the largest privacy settlements in American history. Those settlements include *In re Facebook Biometric Information Privacy Litigation*, No. 3:15-cv-03747 (N.D. Cal. 2020) (approximately $650 million); *Rivera v. Google LLC*, No. 2019-CH-00990 (Cook County Cir. Ct. 2022) (approximately $100 million); and *In re TikTok, Inc., Consumer Privacy Litigation*, No. 1:20-cv-04699 (N.D. Ill. 2022) (approximately $92 million). In late 2025, Google paid $1.375 billion to the State of Texas to resolve parallel claims under Texas's biometric identifier statute, following Texas's $1.4 billion settlement with Meta in 2024 over biometric data collection. By any measure, BIPA's existence, scope, and enforcement profile were on the public record throughout the period during which ElevenLabs developed and trained the foundational voice models that power its commercial products.

104.  ElevenLabs' founding team had reason to know BIPA's obligations specifically. Co-founder and Chief Technology Officer Piotr Dabkowski previously worked as a machine learning engineer at Google during the period in which Google was actively defending the BIPA litigation that would later be settled for approximately $100 million in *Rivera v. Google LLC*. On information and belief, ElevenLabs' founders were aware of BIPA's existence, its application to biometric identifiers extracted from human source material, and its enforcement history at the time ElevenLabs began ingesting voice recordings into its training pipeline.

105.  Voice-AI-specific litigation sharpened the notice further. In May 2024, voice actors brought *Lehrman v. Lovo, Inc.*, No. 1:24-cv-03770 (S.D.N.Y.

55

May 16, 2024), alleging that an AI voice company created and commercialized unauthorized voice clones trained on the plaintiffs' recordings. Three months later, voice actors filed *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024), alleging that ElevenLabs created two of its default synthetic voices by training on copyrighted audiobook narrations without consent. Vacker settled on confidential terms in August 2025; the case was active on ElevenLabs' docket from August 2024 forward. ElevenLabs did not pause the training, deployment, or commercial exploitation of its foundational voice models during the pendency of Vacker. It did not publish a training-data manifest, establish a deletion mechanism for non-user training-data subjects, or extend consent infrastructure to the speakers whose recordings had already been ingested.

*ElevenLabs knew that voice training extracts biometric identifiers*

106.   ElevenLabs' publicly distributed materials, quoted at ¶ 42, acknowledge that the voice data it processes is, or may be, biometric data, and describe ElevenLabs' own processing as analysis of speech characteristics to formulate a distinct voice model of the speaker's vocal traits. A company that recognizes the biometric implications of its technology in its consumer-facing privacy disclosures, that contemporaneously expands its asserted license over the same data, and that describes its own processing in those terms, cannot credibly claim ignorance that its training pipeline extracts biometric identifiers within the meaning of BIPA.

56

*ElevenLabs chose to apply consent selectively*

107. ElevenLabs operates three distinct consent regimes — one for celebrity rights-holders, one for platform users, and none at all for non-user training-data subjects.

108. As described in ¶ 35, ElevenLabs operates the Iconic Marketplace, a consent- and licensing-based program through which named celebrity rights-holders must affirmatively approve commercial use of their voices, and through which ElevenLabs has built and operates the infrastructure to identify specific speakers, track commercial use, share revenue, and enforce consent at the model-output level.

109. Separately, ElevenLabs operates a platform user consent regime through which users who upload their own voices to ElevenLabs' platform must accept Terms of Service before ElevenLabs processes their voice data. That regime, too, exists and operates today.

110. ElevenLabs did not extend either regime, or any equivalent process, to the working voice professionals and other speakers whose voiceprints had already been ingested into the foundational models on which the Iconic Marketplace and the platform user products both depend. The Iconic Marketplace identifies and obtains consent from celebrities ElevenLabs wishes to license, by name. The platform user regime obtains consent from users who walk through ElevenLabs' front door, by Terms of Service acceptance. The non-user training-data subjects — the population that supplied the substrate of every commercial product ElevenLabs sells — receive no notice, no opportunity

57

to refuse, no mechanism to discover whether their voices are in the models, no mechanism to seek removal, and no compensation. ElevenLabs built consent infrastructure for the populations it could not avoid asking, and built none for the population it preferred not to.

*ElevenLabs' post-hoc pattern of remediation confirms deliberateness*

111.   Each corrective step ElevenLabs has taken in connection with its voice synthesis products was undertaken after the relevant legal or reputational risk had materialized, and none addressed the foundational consent failure that gave the company its commercial value. ElevenLabs added voice-cloning verification rules within days of its January 2023 public launch only after exposure of misuse cases. ElevenLabs settled *Vacker* only after a year of litigation; the settlement was confidential, did not identify the speakers whose recordings had been used, and did not establish any non-user mechanism for identification or removal of biometric data. ElevenLabs made the "trained on licensed data and suitable for commercial use" representation for its Eleven Music model in August 2025 — and announced partnerships with Merlin and Kobalt for licensed music content — while making no equivalent representation for its foundational voice models, which were already deployed, monetized, and generating recurring revenue. ElevenLabs launched the Iconic Marketplace in November 2025 only after the rights-of-publicity risk for celebrity voices had become acute.

112.   Each step was a downstream patch on an upstream conduct that ElevenLabs continued to engage in without remediation. ElevenLabs collected,

retained, and commercially exploited the biometric voiceprints of working voice professionals while operating in a legal environment in which the unlawfulness of that conduct in Illinois was settled, publicized, pleaded directly against ElevenLabs in *Vacker*, and acknowledged in ElevenLabs' corporate disclosures. ElevenLabs' core voice synthesis models were trained on voiceprints extracted from speakers who never knew, never consented, and were never given any meaningful opportunity to refuse. Those voiceprints remain in those models today. ElevenLabs chose speed and scale over compliance and built a company currently valued at approximately $11 billion on that choice. That was not an oversight. It was a business decision. Plaintiffs are accordingly entitled to liquidated damages of $5,000 per violation under 740 ILCS 14/20(2), as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), or, in the alternative, $1,000 per violation under 740 ILCS 14/20(1).

## **CLASS ACTION ALLEGATIONS**

113. Plaintiffs bring this action individually and on behalf of all others similarly situated, pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), as the following Class: All natural persons whose voice recordings were produced or recorded in Illinois, and from whose recordings ElevenLabs extracted, derived, or otherwise obtained voiceprints or biometric information in connection with the development, training, fine-tuning, evaluation, or operation of ElevenLabs' foundational voice synthesis models, during the Class Period.

114.   The Class Period runs from the earlier of (a) the date ElevenLabs first ingested any voice recording into the training pipeline for any of its foundational voice synthesis models, or (b) January 1, 2022, through the date of judgment in this action. Discovery will establish the operative start date of the Class Period. ElevenLabs was founded in 2022 and publicly released its beta voice platform on or about January 23, 2023; on information and belief, the foundational voice models that power ElevenLabs' current commercial products — including but not limited to Eleven English v1, Eleven Multilingual v1 and v2, Eleven Flash v2 and v2.5, Eleven Turbo v2 and v2.5, and Eleven v3 — were developed by ingesting voice recordings during this period and continuing thereafter.

115.   Excluded from the Class are: (i) ElevenLabs and its parents, subsidiaries, affiliates, and controlled entities; (ii) the officers, directors, employees, agents, and counsel of ElevenLabs; (iii) the Court, the Court's staff, and any jurors assigned to this action; (iv) the immediate family members of the Court, the Court's staff, and the officers, directors, and controlling persons of ElevenLabs; (v) any individual whose voice is included in ElevenLabs' Iconic Marketplace pursuant to a written licensing agreement, but only with respect to the voice recordings covered by that agreement; (vi) any individual who executed a written release authorizing the alleged collection that complies with 740 ILCS 14/15(b); (vii) any individual who registered for an ElevenLabs account, accepted ElevenLabs' Terms of Service, and affirmatively consented to the use of their submitted voice data for training purposes, but only with

60

respect to the voice data so submitted and so consented to; and (viii) any individual who has previously released their claims against ElevenLabs through a final, non-appealable judgment or a written settlement agreement.

116. Plaintiffs reserve the right to amend or refine the Class definition based on facts learned through discovery. Nothing in the Class definition limits or disclaims claims or remedies available under any statute or theory asserted in this Complaint.

117. *Ascertainability*. Class membership is defined by objective criteria and can be determined from records that exist or will be produced in discovery. Whether a particular voice recording entered ElevenLabs' training pipeline is a binary factual question — the recording is either in the pipeline's ingestion logs or it is not — and the records that answer it are within ElevenLabs' exclusive control. ElevenLabs' November 2025 launch of the Iconic Marketplace, in which ElevenLabs licenses specific named voices on behalf of identified rights-holders, demonstrates that ElevenLabs maintains the infrastructure to identify the specific speakers whose vocal characteristics are encoded in the foundational voice models that power the Iconic Marketplace itself. The same categories of pipeline metadata — training-data manifests, ingestion logs, source-URL records, dataset-version records, voice-model fine-tuning records, and associated speaker- and file-level identifiers — exist for the voice training data on which ElevenLabs built the foundational voice synthesis models identified at ¶ 33. Class membership can be further confirmed through publicly available distribution metadata for voice recordings — audiobook platform records,

podcast directory records, streaming service catalogs, and broadcast archive records — through speaker-identification technology applied to ElevenLabs' training corpus, and through voice-matching analysis comparing ElevenLabs' voice model outputs against publicly available recordings of Class members.

118. *Numerosity.* Joinder of all members of the Class is impracticable. Fed. R. Civ. P. 23(a)(1). ElevenLabs has publicly disclosed that its platform has generated over 100 years of audio output, that employees at over seventy-five percent of Fortune 500 companies use its technology, and that its commercial models support speech generation in over seventy languages. Building voice synthesis models of that scale, quality, and multilingual range required ingestion of a correspondingly large volume of long-form, single-speaker voice training data, drawn from a correspondingly large population of distinct speakers.

119. On information and belief, ElevenLabs' training data includes voice recordings from hundreds of thousands of distinct individual speakers. The Class — limited to natural persons whose voice recordings were produced or recorded in Illinois — includes not only the professional broadcast journalists, audiobook narrators, podcasters, voice actors, voiceover artists, and other voice professionals who have produced work in Illinois during the Class Period — themselves a population numbering in the thousands — but also the interviewees, guests, panelists, witnesses, callers, public officials, and other persons whose voices were captured in Illinois-produced or Illinois-recorded broadcast, podcast, audiobook, archival, and other publicly distributed audio

content, and whose recordings are accessible on the publicly distributed audio platforms from which, on information and belief, ElevenLabs sourced training data. On information and belief, the Illinois Class population numbers in the hundreds of thousands or more. The exact number is within ElevenLabs' exclusive control and will be established through discovery.

120. *Commonality.* Common questions of law and fact apply to every member of the Class. Fed. R. Civ. P. 23(a)(2). ElevenLabs did not engage in any individualized notice, consent, retention-policy disclosure, release, or biometric-data-protection process with respect to any non-user whose voice recordings were ingested into ElevenLabs' foundational voice training pipelines. ElevenLabs' conduct was uniform: the same training pipelines ingested the same categories of publicly distributed voice recordings under the same absent-consent posture, applied to all Class members through the same automated and standardized process. The questions whether ElevenLabs complied with BIPA's notice, consent, retention-policy, profiting, dissemination, and protection requirements before and after extracting Class members' voiceprints can be answered classwide because ElevenLabs' compliance, or noncompliance, was identical as to every Class member.

121. Common questions of law and fact include, without limitation:

(a)    whether the computational representations of vocal characteristics that ElevenLabs extracts during voice-model training — including speaker embeddings, voice-model parameters that encode speaker-specific acoustic features, and the "distinct voice model of [the speaker's] vocal traits" described

63

in ElevenLabs' own CCPA Notice at Collection — constitute "voiceprints" or "biometric information" within the meaning of 740 ILCS 14/10;

(b)      whether ElevenLabs informed Class members in writing that their biometric identifiers or biometric information were being collected, informed them of the specific purpose and length of term of collection, and obtained a written release, as 740 ILCS 14/15(b) requires;

(c)      whether ElevenLabs developed and made publicly available a written retention and destruction policy applicable to the voiceprints and biometric information of non-user training-data subjects, as 740 ILCS 14/15(a) requires;

(d)      whether ElevenLabs sold, leased, traded, or otherwise profited from Class members' biometric identifiers in violation of 740 ILCS 14/15(c), including through subscription tiers, API and developer integrations, the Iconic Marketplace, and the integrated commercial chain through which ElevenLabs' foundational voice models are monetized;

(e)      whether ElevenLabs disclosed, redisclosed, or otherwise disseminated Class members' biometric identifiers to third parties — including through cloud-infrastructure providers, machine-learning pipeline processors, EU–US Data Privacy Framework recipients in the United States, the Netherlands, and Singapore, and the sub-licensable transfers contemplated by ElevenLabs' Terms of Service — without consent and outside any enumerated exception, in violation of 740 ILCS 14/15(d);

64

(f)     whether ElevenLabs stored, transmitted, and protected Class members' biometric identifiers using the reasonable standard of care within ElevenLabs' industry, as 740 ILCS 14/15(e)(1) requires;

(g)     whether ElevenLabs stored, transmitted, and protected Class members' biometric identifiers in a manner that is the same as or more protective than the manner in which ElevenLabs stores, transmits, and protects other confidential and sensitive information — including the audio data of Enterprise customers protected under ElevenLabs' Zero Retention Mode — as 740 ILCS 14/15(e)(2) requires;

(h)     whether ElevenLabs' conduct was intentional, willful, reckless, or negligent within the meaning of 740 ILCS 14/20, 765 ILCS 1075/55, and 815 ILCS 505/10a;

(i)     whether ElevenLabs used Class members' voices and identities for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a);

(j)     whether ElevenLabs' commercial voice products generate, distribute, or make available sound recordings containing "unauthorized digital replicas" of Class members' voices on or after January 1, 2025, and whether ElevenLabs materially contributes to or facilitates such distribution, in violation of 765 ILCS 1075/30 as amended by P.A. 103-836;

(k)     whether ElevenLabs' conduct is "unfair" within the meaning of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505/2, under the framework of *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002);

(l)     whether ElevenLabs' privacy disclosures, and its material omissions regarding training-data provenance, constitute deceptive practices within the meaning of 815 ILCS 505/2;

(m)     whether ElevenLabs' conduct causes likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of voice content generated by ElevenLabs' commercial voice products, in violation of 815 ILCS 510/2(a)(2), and likelihood of confusion or misunderstanding as to affiliation, connection, or association, in violation of 815 ILCS 510/2(a)(3);

(n)     whether ElevenLabs was unjustly enriched by its unauthorized use of Class members' voice data, voiceprints, and biometric information; and

(o)     the appropriate measures of damages, restitution, disgorgement, and injunctive relief, including the model-destruction and retraining remedies sought in the Prayer for Relief.

122.   *Typicality*. The claims of the named Plaintiffs are typical of the claims of the Class. Fed. R. Civ. P. 23(a)(3). Each named Plaintiff produced voice recordings in Illinois — broadcast journalism, audio reporting, audiobook narration, podcast production, and related professional voice work, recorded in Chicago studios, broadcast facilities, and home recording studios in this District. ElevenLabs, on information and belief, ingested those recordings into the training pipelines for its foundational voice synthesis models and extracted voiceprints from them without notice, consent, or written release. The

66

voiceprints are now embedded in or operationalized through ElevenLabs' commercial voice models identified at ¶ 33 — and reproduced in the audio that those models generate when invoked through ElevenLabs' text-to-speech, Voice Cloning, AI Dubbing, Conversational AI, and Voice Design products.

123. The legal theories asserted on behalf of the Class — that ElevenLabs' extraction, retention, profiting from, dissemination, and inadequate protection of voiceprints violate BIPA; that ElevenLabs' commercial use of voices and identities without prior written consent violates IRPA; that ElevenLabs' unfair and deceptive practices violate ICFA; that ElevenLabs' conduct causes confusion in violation of IUDTPA; and that ElevenLabs has been unjustly enriched at the expense of Class members — apply equally to the named Plaintiffs and to every Class member.

124. *Adequacy.* The named Plaintiffs will fairly and adequately protect the interests of the Class. Fed. R. Civ. P. 23(a)(4). The named Plaintiffs' interests are aligned with, and not antagonistic to, the interests of the Class. The named Plaintiffs have no conflicts of interest with the Class. The named Plaintiffs are represented by counsel experienced in complex class action litigation, privacy litigation, and BIPA litigation, with the resources to prosecute this action vigorously on behalf of the Class.

125. *Rule 23(b)(2) Certification.* Certification under Rule 23(b)(2) is appropriate because ElevenLabs has acted on grounds generally applicable to the Class, such that final injunctive and corresponding declaratory relief is appropriate as to the Class as a whole. Fed. R. Civ. P. 23(b)(2). ElevenLabs'

training pipelines operated uniformly across every Class member's voice recordings; ElevenLabs' failure to obtain BIPA-compliant consent was uniform; ElevenLabs' failure to publish a retention and destruction policy applicable to non-user training-data subjects was uniform; ElevenLabs' failure to apply biometric-specific protection commensurate with the Zero Retention Mode regime it offers to Enterprise customers was uniform; and ElevenLabs' continuing possession and commercial exploitation of Class members' voiceprints — through subscriptions, the API, the Iconic Marketplace, and the integrated commercial chain alleged in the Factual Background — is uniform. Plaintiffs seek classwide injunctive relief under 740 ILCS 14/20, 815 ILCS 510/3 (IUDTPA, which authorizes only injunctive relief), and the equitable jurisdiction of this Court — including the destruction or retraining of the foundational voice synthesis models in which Class members' voiceprints are encoded — that necessarily applies on the same terms to every Class member.

126. *Rule 23(b)(3) Certification.* Certification under Rule 23(b)(3) is appropriate for the Class on the damages and restitutionary claims asserted in this Complaint, including the claims under BIPA, IRPA, ICFA, IUDTPA, and Illinois common law for unjust enrichment, because common questions of law and fact predominate over questions affecting only individual members of the Class, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

127. *Predominance.* The questions that drive this litigation are common to the Class and predominate over individual questions. Whether ElevenLabs'

voice-model training pipelines extract voiceprints within the meaning of BIPA is a common technical question with a common answer, grounded in ElevenLabs' own descriptions of its processing as quoted at ¶ 42. Whether ElevenLabs complied with BIPA's notice, consent, retention, profiting, dissemination, and protection requirements is a common legal question with a common answer — ElevenLabs did not, with respect to any non-user whose voice recordings were ingested into the training pipelines. Whether ElevenLabs' conduct was willful or reckless turns on ElevenLabs' institutional knowledge, decision-making, and conduct, all of which are common to the Class. The principal individual question — whether a specific Class member's voice recordings entered the training pipelines — is binary and resolvable from ElevenLabs' own records, including the training-data manifests, ingestion logs, source-URL records, and dataset-version records in ElevenLabs' exclusive control. Individual damages calculations under BIPA's per-person, per-subsection liquidated-damages framework, 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), do not predominate over the common liability questions because the per-violation amounts are statutorily fixed and do not require individualized proof of actual damages.

128.     *Superiority.* A class action is the superior method for adjudicating these claims.

(a)     *Class members' interest in individual control.* Class members are voice professionals — journalists, audiobook narrators, podcasters, voiceover artists — and incidental speakers whose voiceprints were extracted without

69

their knowledge. Many Class members are unaware their biometric identifiers were ever taken. Even those who become aware face the prospect of individual litigation against a privately held technology company of the scale described at ¶ 31. Statutory damages amounts that are meaningful in the aggregate are likely too modest in individual cases to justify the cost and burden of independent representation. A class action is the only realistic vehicle for redressing the violations alleged in this Complaint.

(b)     *Existing related litigation.* Plaintiffs are unaware of any other action asserting these claims against ElevenLabs on behalf of persons whose voice recordings were produced or recorded in Illinois and used to train ElevenLabs' foundational voice synthesis models. *Vacker v. Eleven Labs, Inc.*, settled on confidential terms in August 2025 without classwide adjudication of the conduct, without classwide adjudication of any remedy, and without any public mechanism through which other non-user training-data subjects could obtain identification or removal of biometric data extracted from their recordings. The continued absence of any classwide adjudication of ElevenLabs' training-data conduct as it relates to Illinois biometric privacy law makes a class action in this forum particularly appropriate.

(c)     *Desirability of concentration in this forum.* Concentration of this litigation in this District is appropriate. Plaintiffs are Illinois residents whose recordings were produced or recorded in Illinois. The claims arise under Illinois statutes — BIPA, IRPA, ICFA, and IUDTPA — that the Illinois General Assembly enacted to protect the biometric, identity, and consumer interests of persons in

Illinois. The injuries were and are suffered in Illinois. ElevenLabs conducts substantial commercial business in Illinois, including through subscription, API, and enterprise licensing of its voice AI products to Illinois-based customers and Illinois-headquartered Fortune 500 companies, as alleged in the Jurisdiction and Venue section. This Court is well-suited to adjudicate BIPA and other Illinois statutory claims arising from ElevenLabs' commercial conduct in Illinois.

(d)     *Manageability*. The case is manageable as a class action. ElevenLabs' conduct was automated, uniform, and standardized; the common questions identified above are susceptible to common proof; Class membership can be determined from ElevenLabs' records, supplemented as needed by publicly available distribution metadata and voice-matching analysis; and BIPA's per-person, per-subsection liquidated-damages framework eliminates the need for individualized damages calculations on the principal claim. No unusual management difficulties are anticipated.

129.   To the extent any portion of the Class Period predates the limitations period applicable to any claim asserted in this action, Plaintiffs allege that the limitations periods are equitably tolled by ElevenLabs' concealment of its training-data sources, by its failure to provide any notice of its collection of biometric identifiers, by Plaintiffs' inability through reasonable diligence to discover that ElevenLabs had ingested their recordings into its training pipelines, and by the continuing nature of ElevenLabs' violations.

71

## CLAIMS FOR RELIEF

### Count I

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(b)

*Brought on behalf of the Class*

130. Plaintiffs reallege and incorporate by reference all allegations in this complaint.

131. Plaintiffs bring this Count individually and on behalf of the Class.

132. BIPA defines "biometric identifier" to include a "voiceprint," and defines "biometric information" to include "any information, regardless of how it is captured, converted, stored, or shared, based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. Section 15(b) prohibits a private entity from collecting, capturing, purchasing, receiving through trade, or otherwise obtaining a person's biometric identifier or biometric information unless the entity first (i) informs the subject in writing that a biometric identifier or biometric information is being collected or stored, (ii) informs the subject in writing of the specific purpose and length of term for which the biometric identifier or biometric information is being collected, stored, and used, and (iii) receives a written release executed by the subject. 740 ILCS 14/15(b).

133. ElevenLabs is a "private entity" within the meaning of BIPA. 740 ILCS 14/10.

134. ElevenLabs collected, captured, and otherwise obtained voiceprints and biometric information from the voice recordings of Plaintiffs and Class

72

members by ingesting their voice recordings into its training pipeline and extracting from those recordings computational representations capable of identifying the speakers, as alleged in detail in the Factual Background. The resulting representations — speaker embeddings, voice-model parameters that encode speaker-specific acoustic features, and the "distinct voice model of [the speaker's] vocal traits" described in ElevenLabs' CCPA Notice at Collection — are voiceprints and biometric information within the meaning of BIPA.

135. ElevenLabs did not, before extracting Plaintiffs' or Class members' voiceprints, inform any Plaintiff or Class member in writing that their biometric identifiers were being collected or stored; did not inform any of them in writing of the specific purpose or length of term of collection, storage, and use; and did not receive a written release executed by any of them. ElevenLabs obtained no consent of any kind, in any form, from any Plaintiff or Class member.

136. ElevenLabs' violations of § 15(b) were intentional or reckless, as alleged in ¶¶ 102-112. In the alternative, ElevenLabs' violations were negligent.

137. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20, including, for each Class member, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with the statute as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation; injunctive relief; and reasonable attorneys' fees, costs, and any other relief the Court deems just and proper.

## Count II

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(a)

*Brought on behalf of the Class*

138. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

139. Plaintiffs bring this Count individually and on behalf of the Class.

140. Section 15(a) of BIPA requires a private entity in possession of biometric identifiers or biometric information to develop a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying biometric identifiers and biometric information when the initial purpose for collecting or obtaining such identifiers or information has been satisfied, or within three years of the individual's last interaction with the private entity, whichever occurs first. 740 ILCS 14/15(a). Because Class members never interacted with ElevenLabs in connection with the collection of their biometric data, the operative destruction prong for Class members is that biometric identifiers and biometric information be destroyed when the initial purpose for their collection has been satisfied.

141. ElevenLabs has been, and remains, in possession of voiceprints and biometric information extracted from the voice recordings of Plaintiffs and Class members.

142. ElevenLabs has not developed and made publicly available a retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training-data subjects and embedded in

74

or operationalized through the parameters of ElevenLabs' foundational voice synthesis models, as alleged in the Factual Background. ElevenLabs' published privacy policy ties biometric data retention to "the termination of our relationship with you," a provision facially inapplicable to Plaintiffs, who had no "relationship" with ElevenLabs to terminate. ElevenLabs has not made any other retention or destruction policy applicable to non-user training-data subjects publicly available, and has not provided any mechanism by which Plaintiffs or other non-user training-data subjects may seek access to, correction of, or removal of their biometric data.

143. ElevenLabs' Terms of Service assert perpetual, irrevocable, royalty-free, worldwide rights to models derived from voice data, including after deletion of the underlying source recordings. As alleged at ¶ 58, the biometric characteristics extracted during training persist in the parameters of ElevenLabs' commercial models notwithstanding any deletion of the underlying recordings. ElevenLabs has not publicly identified any process for the destruction of biometric data encoded in or operationalized through those models.

144. ElevenLabs' violations of § 15(a) were intentional or reckless, as alleged in ¶¶ 102-112. In the alternative, ElevenLabs' violations were negligent.

145. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

75

## Count III

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(c)

*Brought on behalf of the Class*

146. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

147. Plaintiffs bring this Count individually and on behalf of the Class.

148. Section 15(c) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may sell, lease, trade, or otherwise profit from a person's or a customer's biometric identifier or biometric information. 740 ILCS 14/15(c). The phrase "otherwise profit from" is a statutory catch-all that extends beyond the enumerated forms of selling, leasing, and trading.

149. ElevenLabs has sold, leased, traded, and otherwise profited from the voiceprints and biometric information of Plaintiffs and Class members through the integrated commercial chain alleged in the Factual Background. The commercial value of ElevenLabs' subscription tiers, API and developer offerings, Iconic Marketplace licensing transactions, audiobook generation and distribution products, Conversational AI and voice agent enterprise contracts, and AI dubbing and Voice Design products is constituted by the voiceprints and biometric information encoded in or operationalized through ElevenLabs' foundational voice synthesis models. The voice quality, expressiveness, speaker similarity, and multilingual capability that ElevenLabs sells through these

channels exists because of the voiceprints and biometric information extracted during training.

150. ElevenLabs' Professional Voice Cloning documentation describes the cloning process as creating "a near-perfect clone of what it hears, including all the intricacies and characteristics of [the] voice." The "intricacies and characteristics" that ElevenLabs' commercial products reproduce are the biometric features ElevenLabs extracted during training. The voiceprint is not a backstage input to ElevenLabs' product line; it is the product. At this point, the biometric data and the product are the same thing.

151. ElevenLabs' November 2025 launch of the Iconic Marketplace confirms ElevenLabs' treatment of voiceprints as transactable commercial assets. The Iconic Marketplace, by its operation, sells third parties the right to generate audio using the voiceprints of named rights-holders, in exchange for consideration shared between ElevenLabs and the rights-holder. Plaintiffs' voiceprints sit inside the same foundational voice synthesis models that power the Iconic Marketplace, and ElevenLabs profits from those models in the same way it profits from the Iconic Marketplace — through the sale of voice synthesis capability whose value is constituted by the voiceprints encoded in the underlying models. No enumerated exception under § 15(c) applies.

152. ElevenLabs' violations of § 15(c) were intentional or reckless, as alleged in ¶¶ 102-112. In the alternative, ElevenLabs' violations were negligent.

153. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count IV

### Violation of the Illinois Biometric Information Privacy Act, 740 ILCS 14/15(d)

*Brought on behalf of the Class*

154.   Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

155.   Plaintiffs bring this Count individually and on behalf of the Class.

156.   Section 15(d) of BIPA provides that no private entity in possession of a biometric identifier or biometric information may disclose, redisclose, or otherwise disseminate a person's or a customer's biometric identifier or biometric information unless an enumerated exception applies. 740 ILCS 14/15(d).

157.   ElevenLabs has disclosed, redisclosed, and otherwise disseminated voiceprints and biometric information derived from Plaintiffs' and Class members' voice recordings in three categories of conduct, each independently sufficient to violate § 15(d), and as alleged in the Factual Background.

158.   *First*, ElevenLabs has, on information and belief, transmitted voiceprints and biometric information — encoded in or operationalized through its foundational voice synthesis models — to cloud-infrastructure providers, machine-learning pipeline processors, and other vendors and service providers that operate the training, fine-tuning, evaluation, and inference systems on which ElevenLabs' commercial products run.

159.   *Second*, ElevenLabs has, on information and belief, transmitted voiceprints and biometric information across jurisdictions, including to

78

affiliates, vendors, and processors in the United States, the Netherlands, and Singapore, as reflected in ElevenLabs' Terms of Service and EU–US Data Privacy Framework Policy.

160. *Third*, ElevenLabs' Terms of Service grant ElevenLabs a sub-licensable license through "multiple tiers" of recipients, and ElevenLabs has, on information and belief, exercised that sub-licensing authority in connection with Enterprise on-premises model deployments, fine-tuning and customization arrangements, and API integration arrangements through which the encoded biometric characteristics of Plaintiffs and Class members are transmitted to recipients outside ElevenLabs' direct control.

161. Plaintiffs and Class members did not consent to any of these disseminations. No enumerated exception under § 15(d) applies.

162. ElevenLabs' violations of § 15(d) were intentional or reckless, as alleged in ¶¶ 102-112. In the alternative, ElevenLabs' violations were negligent.

163. Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count V

### Violation of the Illinois Biometric Information Privacy Act,
### 740 ILCS 14/15(e)

*Brought on behalf of the Class*

164. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

165. Plaintiffs bring this Count individually and on behalf of the Class.

79

166. Section 15(e) of BIPA imposes two independent and conjunctive obligations on a private entity in possession of biometric identifiers or biometric information. *First*, the entity must store, transmit, and protect biometric identifiers and biometric information from disclosure using the reasonable standard of care within the entity's industry. 740 ILCS 14/15(e)(1). *Second*, the entity must do so in a manner that is the same as or more protective than the manner in which the entity stores, transmits, and protects other confidential and sensitive information. 740 ILCS 14/15(e)(2). A failure of either obligation is a violation.

167. ElevenLabs possesses voiceprints and biometric information derived from Plaintiffs' and Class members' voice recordings, embedded in or operationalized through ElevenLabs' foundational voice synthesis models, training-data caches, fine-tuning pipelines, default voice library, and inference systems, as alleged in ¶¶ 9, 40, 58.

168. The reasonable standard of care for the handling of biometric voice data within the AI voice synthesis industry and the broader industry of biometric-data handlers is reflected in established information-security and privacy frameworks, including NIST Special Publication 800-53 (controls for information systems, including asset management, access control, audit and accountability, and information handling), NIST Special Publication 800-63B (digital identity guidelines applicable to the handling of biometric template data), ISO/IEC 27001 (information-security management systems), and ISO/IEC 24745 (biometric information protection).

169. Each of these frameworks requires that an entity in possession of biometric data, at minimum, (a) maintain an inventory of the biometric data in its possession, including the identity of the data subjects to whom that data pertains; (b) implement access controls and audit-logging capabilities tied to specific data subjects; (c) apply protections against unauthorized disclosure commensurate with the sensitivity of biometric data; (d) maintain capabilities to honor data-subject rights, including access, correction, and deletion on request; and (e) impose recipient-side controls on biometric data transmitted to third parties, including contractual deletion obligations, audit rights, and provenance tracking.

170. ElevenLabs has failed to satisfy the § 15(e)(1) standard with respect to both storage and transmission of biometric data. On information and belief, and as alleged at ¶¶ 48, 50, ElevenLabs does not maintain a record identifying which voiceprints, biometric information, speaker embeddings, or model parameters in its possession derive from which individual training-data subjects; has not published any model card, data sheet, training-data manifest, or transparency report describing those subjects or the provenance of speaker-specific representations within its models; and has not implemented any opt-out, removal, or data-subject-rights process for non-users whose voice recordings may have been used in training. An entity that does not know which biometric data it possesses, which data subjects that data pertains to, or where that data resides within its systems cannot meaningfully store, transmit, or protect that data using the reasonable industry standard of care. Such an

81

entity cannot apply differential access controls based on data subject; cannot generate audit trails tied to specific data subjects; cannot detect unauthorized internal access to a particular subject's biometric data; cannot respond to lawful subpoenas, deletion requests, or correction requests directed at a particular subject's data; and cannot ensure that biometric data is removed when retention obligations expire.

171. ElevenLabs has further failed the § 15(e)(1) standard with respect to the transmission of biometric data. Reasonable industry care for biometric-data transmission requires recipient-side controls — including contractual deletion obligations, audit rights, technical access restrictions, deletion-on-revocation requirements, and provenance tracking — imposed on recipients of biometric template data. On information and belief, ElevenLabs imposes none of these controls on the recipients of its models, model-derived outputs, or biometric-encoding-bearing parameters transmitted through Enterprise on-premises deployments, fine-tuning and customization arrangements, API integrations, or cross-jurisdictional data transfers. ElevenLabs' Terms of Service grant ElevenLabs a sub-licensable license through "multiple tiers" of recipients without imposing biometric-specific recipient-side obligations. Under reasonable industry standards for biometric template data, those omissions are protection failures.

172. Section 15(e)(2) imposes an asymmetry test: a private entity satisfies it only if its protection of biometric data is at least equal to its protection of its own other confidential and sensitive information. A generally

82

adequate security posture does not satisfy § 15(e)(2) if the entity protects its other confidential information with greater care than it protects biometric data.

173. ElevenLabs fails the § 15(e)(2) asymmetry test. ElevenLabs offers a "Zero Retention Mode" feature for Enterprise customers' confidential audio data, under which ElevenLabs commits not to retain user-submitted audio after processing, to preserve no record of input data once a request is processed, and to remove the data from its systems continuously. Zero Retention Mode is, in substance, a heightened-protection regime for confidential and sensitive customer information that ElevenLabs has built and deploys. ElevenLabs has demonstrated the technical capability to apply such a heightened-protection regime to voice and audio data within its systems. ElevenLabs has elected, however, to limit Zero Retention Mode to Enterprise-tier customers and to exclude voice cloning workflows — which involve the processing of biometric voiceprints — from Zero Retention treatment.

174. ElevenLabs applies no comparable heightened-protection regime to the biometric data extracted from Plaintiffs' and Class members' voice recordings. Plaintiffs are not parties to ElevenLabs' commercial agreements; they have no Enterprise contract, no Zero Retention election available to them, and no contractual or technical assurance that their biometric data is treated with even the protection ElevenLabs offers to its paying customers' confidential audio inputs. ElevenLabs' decision to apply Zero Retention Mode to its Enterprise customers' confidential audio while applying no comparable protection to the biometric data of the non-user training subjects whose

voiceprints constitute the substrate of ElevenLabs' commercial products is a structural § 15(e)(2) violation. Section 15(e)(2) requires biometric data to be protected in a manner that is the same as or more protective than the manner in which the entity protects other confidential and sensitive information; ElevenLabs treats Enterprise customers' audio data as confidential and sensitive, and protects it accordingly; it does not extend that protection to Plaintiffs' biometric voice data.

175.   ElevenLabs' failures under each of the theories alleged in this Count have caused, and continue to cause, concrete injury to Plaintiffs and the Class. Plaintiffs' biometric data is in ElevenLabs' possession in a state of inadequate inventory, inadequate access control, and inadequate transmission control. As a consequence, Plaintiffs cannot ascertain the disposition of their biometric data; Plaintiffs cannot exercise meaningful control over its retention, transmission, or deletion; Plaintiffs' biometric data is exposed to disclosure, transmission, and use by third parties without the biometric-specific safeguards reasonable industry care requires; and Plaintiffs bear the ongoing risk of unauthorized disclosure, replication, or commercial reuse of their irreplaceable biometric voice signatures.

176.   ElevenLabs' violations of § 15(e) were intentional or reckless, as alleged in ¶¶ 102-112. In the alternative, ElevenLabs' violations were negligent.

177.   Plaintiffs and the Class seek all relief available under 740 ILCS 14/20 on the terms set forth in Count I.

## Count VI

### Violation of the Illinois Right of Publicity Act,
### 765 ILCS 1075/1 et seq.

*Brought on behalf of the Class*

178. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

179. Plaintiffs bring this Count individually and on behalf of the Class.

180. The Illinois Right of Publicity Act protects an individual's right to control commercial use of their identity. IRPA defines "identity" to include "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener," and expressly enumerates "voice" among the protected attributes. 765 ILCS 1075/5. IRPA establishes two distinct liabilities relevant to this Count: a prohibition on the commercial use of an individual's identity without prior written consent under 765 ILCS 1075/30(a), and, as amended by P.A. 103-836 effective January 1, 2025, a prohibition on the knowing distribution, transmission, or making available of sound recordings containing "unauthorized digital replicas" of an individual's voice, together with liability for material contribution to such distribution.

181. Each Plaintiff and each Class member is an individual whose distinctive voice — including timbre, tone, cadence, phrasing, accent, and stylistic vocal expression — is part of the individual's identity within the meaning of IRPA.

182. ElevenLabs used Plaintiffs' and Class members' identities for commercial purposes within the meaning of 765 ILCS 1075/30(a). ElevenLabs

85

extracted and modeled the distinctive vocal characteristics embodied in Plaintiffs' and Class members' voice recordings and used those characteristics to develop, train, and operate the commercial voice synthesis products that ElevenLabs monetizes through the integrated commercial chain alleged in the Factual Background, including its subscription tiers, API and developer offerings, Iconic Marketplace, audiobook generation and distribution products, Conversational AI and voice agent products, and AI dubbing and Voice Design products. ElevenLabs holds out its products' ability to generate realistic, expressive, and multilingual human-sounding voices — and, in the case of its Voice Cloning products, their ability to produce "a near-perfect clone … including all the intricacies and characteristics of [the] voice" — as a core commercial feature, a capability built from the identities of the individuals whose recordings supplied the training data. ElevenLabs did not obtain prior written consent from any Plaintiff or Class member to use their identity, including their voice, for any commercial purpose.

183. As amended by P.A. 103-836 effective January 1, 2025, IRPA further prohibits knowingly distributing, transmitting, or making available to the general public a sound recording or audiovisual work containing an "unauthorized digital replica" of an individual without the individual's consent, and imposes liability on any person who "materially contributes to, induces, or facilitates" such distribution with actual knowledge that the other person is infringing upon an individual's rights. An "unauthorized digital replica" includes a newly created, computer-generated electronic representation of an

86

individual's voice fixed in a sound recording in which the individual did not actually perform.

184.  ElevenLabs creates, names, catalogs, and distributes a library of default voices made available to all users of its platform. ElevenLabs' Professional Voice Cloning documentation describes the cloning process used to create such voices as producing "a near-perfect clone of what it hears, including all the intricacies and characteristics of that voice." On information and belief, one or more of the default voices distributed by ElevenLabs through its platform replicates the distinctive vocal characteristics of one or more Plaintiffs or Class members, was generated from voiceprints derived from their recordings, and was distributed without their consent. In *Vacker v. Eleven Labs, Inc.*, No. 1:24-cv-00987 (D. Del. filed Aug. 29, 2024), two of ElevenLabs' default voices, "Bella" and "Adam," were alleged to have been derived from unconsented audiobook narrations, establishing that ElevenLabs' default voice library has historically been built from voiceprints extracted from unconsented training data. The identification of specific default voices that replicate particular Plaintiffs requires forensic comparison and the production of ElevenLabs' internal records linking default voices to source training audio; specific identifications will be developed through discovery and supplemental pleading.

185.  Independent of the default voice library, ElevenLabs operates Voice Cloning, Voice Design, Professional Voice Cloning, AI Dubbing, Conversational AI, and API products that enable users to generate, on demand, audio outputs

replicating the voice of any individual whose recordings the user can supply. ElevenLabs' Instant Voice Cloning product produces voice clones from as little as thirty seconds of source audio. Plaintiffs' recordings are publicly available across major distribution platforms in quantities that exceed this technical threshold by orders of magnitude. On information and belief, ElevenLabs has, on or after January 1, 2025, knowingly facilitated the generation and distribution of unauthorized digital replicas of Plaintiffs' and Class members' voices by third-party users of ElevenLabs' platform, in violation of IRPA as amended.

186. ElevenLabs maintains internal records of every voice cloning, generation, and API call performed on its platform, including the audio used to seed each clone, the user who initiated each generation, and the disposition of each output. The factual basis for the on-information-and-belief allegation in ¶ 185 includes:

(a) ElevenLabs' Voice Cloning tools designed for and marketed as enabling voice replication of any speaker;

(b) ElevenLabs' user base exceeding one million registered users and over one hundred years of audio generated on the platform;

(c) Plaintiffs' publicly available recordings, comprising hundreds or thousands of hours of single-speaker, studio-quality audio readily usable as cloning source material;

(d) ElevenLabs' acknowledgment of voice cloning misuse on its platform;

(e)     documented use of ElevenLabs' tools to clone the voices of public figures, including the January 2024 deployment in which an AI-generated clone of President Biden's voice, reported in multiple published sources to have been created using ElevenLabs' technology, was used in robocalls to suppress voter turnout in the New Hampshire presidential primary, resulting in a $6 million FCC forfeiture; and

(f)     ElevenLabs' commercial incentive to continue offering tools that produce such outputs notwithstanding such misuse. The identification of specific third-party users who cloned the voices of Plaintiffs or Class members, the specific outputs they generated, and the recipients of such outputs are facts within ElevenLabs' exclusive possession and control.

187.   ElevenLabs' provision of these tools, its operation of the platform on which they run, and its retention of the resulting outputs constitute material contribution to and facilitation of the distribution of unauthorized digital replicas within the meaning of IRPA as amended by P.A. 103-836.

188.   ElevenLabs' violations of IRPA were willful and knowing, as alleged in ¶¶ 102-112. ElevenLabs' November 2025 launch of the Iconic Marketplace — a consent-based licensing framework for celebrity voices — demonstrates that ElevenLabs understood that voice-based AI products require consent from the people whose voices are used. ElevenLabs implemented consent for celebrity voices it wished to license but did not implement consent for the individuals whose voices it had already used to train its foundational models.

189. Plaintiffs and the Class have suffered and continue to suffer injury from ElevenLabs' IRPA violations, including loss of control over the commercial use of their identities and voices, dilution and commodification of their distinctive voices, and economic harm — including the diversion of licensing value and diminished demand for authentic vocal performances — in the markets where Plaintiffs and Class members earn their livelihoods.

190. Plaintiffs and the Class seek all relief available under 765 ILCS 1075/40, including actual damages, profits attributable to ElevenLabs' unauthorized use of their identities and voices, the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are less than that amount, punitive damages where ElevenLabs' violations are found willful, injunctive relief, attorneys' fees pursuant to 765 ILCS 1075/55, and such other relief as the Court deems just and proper.

### Count VII

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq.

*Brought on behalf of the Class*

191. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

192. Plaintiffs bring this Count individually and on behalf of the Class.

193. The Illinois Consumer Fraud and Deceptive Business Practices Act prohibits "unfair or deceptive acts or practices … in the conduct of any trade or commerce." 815 ILCS 505/2. ICFA's prohibition of unfair practices reaches

conduct that, even absent affirmative misrepresentation, (i) offends Illinois public policy, (ii) is immoral, unethical, oppressive, or unscrupulous, or (iii) causes substantial injury to consumers that consumers could not reasonably have avoided. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417–18 (2002). The three factors need not all be satisfied; a sufficiently strong showing on any one may suffice.

194.   ElevenLabs engaged in trade and commerce in Illinois within the meaning of ICFA by marketing, offering, and distributing voice synthesis products and services to Illinois consumers and Illinois-based businesses, and by collecting, extracting, and commercially exploiting the biometric identifiers and biometric information of Illinois persons in connection with that commerce.

195.   ElevenLabs' conduct is unfair within the meaning of ICFA under each of the three Robinson factors. *First*, ElevenLabs' collection and commercial exploitation of the biometric identifiers and biometric information of Illinois persons without their knowledge, consent, or opportunity to refuse offends established Illinois public policy as expressed in BIPA — the Illinois statute the General Assembly enacted specifically to protect biometric privacy, 740 ILCS 14/5 — and as expressed in IRPA — the Illinois statute the General Assembly enacted specifically to protect commercial use of personal identity, 765 ILCS 1075/30. ElevenLabs' conduct is the precise category of conduct these statutes were enacted to prohibit.

91

196. *Second*, ElevenLabs' conduct is immoral, unethical, oppressive, and unscrupulous. ElevenLabs commercially exploited the irreplaceable biometric identifiers of Illinois voice professionals without notice, consent, compensation, or any mechanism through which the affected speakers could even discover that their voices had been taken. ElevenLabs simultaneously built and deployed consent infrastructure — the Iconic Marketplace, the Voice Cloning verification rules — for the celebrity voices and the platform users it could not avoid asking, while withholding any equivalent process from the working voice professionals whose voiceprints had already been ingested into the foundational models on which the entire company depends.

197. *Third*, ElevenLabs' conduct caused substantial injury to Plaintiffs and Class members — including lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities — and Plaintiffs and Class members could not reasonably have avoided this injury, because they had no knowledge that ElevenLabs was collecting their biometric data and no public mechanism existed through which they could have discovered the collection or sought its cessation.

198. ElevenLabs' conduct is also independently deceptive within the meaning of ICFA. ElevenLabs' privacy disclosures use hedging language regarding the biometric nature of the voice data ElevenLabs processes — stating that "applicable law may define [users'] Voice Data as biometric data" and that voice data "may comprise biometric data under applicable data

92

protection laws" — to obscure the categorical nature of the processing ElevenLabs actually performs. ElevenLabs' CCPA Notice at Collection contemporaneously describes that same processing as "analyz[ing] [the speaker's] speech characteristics to formulate a distinct voice model of [the speaker's] vocal traits," a description that, by its terms, is the description of biometric processing. The hedging language is materially misleading because it presents as conditional what ElevenLabs' own technical descriptions confirm is categorical.

199. ElevenLabs has further maintained total opacity about the sources of its voice training data while commercially exploiting that data at scale. ElevenLabs has not published any model card, data sheet, training-data manifest, transparency report, or other disclosure identifying the speakers whose recordings were ingested into its foundational voice synthesis models, even as ElevenLabs has separately and contemporaneously represented that its music model was "trained on licensed data and suitable for commercial use" and announced licensing partnerships with Merlin and Kobalt for music content. The asymmetry between ElevenLabs' affirmative licensing representation for its music model and its silence regarding its voice models is itself a material omission — a representation by negative implication that the voice models were licensed in a manner ElevenLabs has not and cannot substantiate.

200. ElevenLabs' unfair and deceptive conduct proximately caused actual injury to Plaintiffs and Class members, including lost and diminished

licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities. These injuries flow directly from ElevenLabs' decision to collect and commercially exploit Plaintiffs' biometric data without authorization, not merely from the existence of competing AI products.

201.  ElevenLabs' conduct was willful, knowing, and in reckless disregard of the rights and interests of Plaintiffs and Class members, as alleged in ¶¶ 102-112.

202.  Plaintiffs and the Class seek all relief available under ICFA, including actual economic damages, punitive damages under 815 ILCS 505/10a(c), injunctive relief, attorneys' fees and costs, and such other relief as the Court deems just and proper.

### Count VIII

### Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 et seq.

*Brought on behalf of the Class (injunctive relief only)*

203.  Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

204.  Plaintiffs bring this Count individually and on behalf of the Class, seeking injunctive relief under 815 ILCS 510/3.

205.  The Illinois Uniform Deceptive Trade Practices Act prohibits a person from engaging in conduct that, in the course of business, "causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services," 815 ILCS 510/2(a)(2), or "causes

94

likelihood of confusion or of misunderstanding as to affiliation, connection, or association with or certification by another," 815 ILCS 510/2(a)(3).

206. ElevenLabs' commercial voice products generate voice outputs that sound like real human speakers, including, on information and belief, voice outputs that replicate or closely simulate the distinctive vocal characteristics of Plaintiffs and Class members. Once generated, these voice outputs can be downloaded, shared, and commercially exploited by ElevenLabs' subscribers and end users without consumer-facing disclosure that the voice was AI-generated, that the model that generated the voice was built using voiceprints collected without consent, or that the individual whose vocal characteristics are reproduced has not authorized the use. The absence of disclosure creates likelihood of confusion or misunderstanding about whether real persons created, endorsed, sponsored, approved, or have any affiliation with the AI-generated voice content, in violation of both 815 ILCS 510/2(a)(2) and 815 ILCS 510/2(a)(3).

207. Plaintiffs and Class members are persons likely to be damaged by ElevenLabs' deceptive practices within the meaning of 815 ILCS 510/3. ElevenLabs' conduct diverts demand from licensed human voice performances and impairs source attribution and authorization-status disclosure in the voice services markets where Plaintiffs and Class members earn their livelihoods. Actual confusion and actual damages need not be shown to obtain injunctive relief.

208. Plaintiffs and the Class seek preliminary and permanent injunctive relief under 815 ILCS 510/3 to prevent ElevenLabs' ongoing deceptive trade practices, including such corrective disclosures and provenance measures as the Court deems necessary to prevent confusion regarding the source, authorization, and consent status of AI-generated voice content. If the Court finds that ElevenLabs willfully engaged in deceptive trade practices, Plaintiffs also seek reasonable attorneys' fees under 815 ILCS 510/3.

## Count IX

## Unjust Enrichment (Illinois Common Law)

*Brought on behalf of the Class*

209. Plaintiffs reallege and incorporate by reference all allegations in this Complaint.

210. Plaintiffs bring this Count individually and on behalf of the Class. This Count is pled in the alternative pursuant to Fed. R. Civ. P. 8(d)(2)–(3). Plaintiffs do not seek duplicative recovery.

211. ElevenLabs obtained substantial benefits from Plaintiffs' and Class members' voice recordings, voiceprints, biometric information, and associated identity attributes without permission and without compensation. These benefits include the avoided costs of licensing and consent for the voice recordings used in training; the product capability, voice quality, expressiveness, and multilingual range derived from training on a diverse corpus of identifiable human voices; the competitive advantage of an AI voice product that would not otherwise exist; and the revenue from the

96

commercialization of voice synthesis products built on that foundation. As alleged in the Factual Background, the voiceprint is not a backstage input to ElevenLabs' product line; it is the product.

212.    ElevenLabs received these benefits at Plaintiffs' and Class members' expense. Plaintiffs and Class members invest time, talent, training, and resources to develop their voices and to create the professional voice recordings ElevenLabs has used without consent. ElevenLabs' conduct diverted value from Plaintiffs by building commercial products on their voices without authorization and deploying those products to compete with and displace Plaintiffs in the same professional markets in which Plaintiffs earn their livelihoods.

213.    ElevenLabs' retention of these benefits is unjust because it is rooted in conduct that constitutes (a) the collection and commercial exploitation of Illinois residents' biometric identifiers and biometric information without the notice, consent, and other safeguards BIPA requires, and (b) the commercial use of Illinois residents' voices and identities without the prior written consent IRPA requires. Each of these wrongs independently renders ElevenLabs' retention of benefits inequitable. ElevenLabs could have pursued lawful licensing, as it did for its music model and as it does for its Iconic Marketplace celebrity voices, and chose not to.

214.    Plaintiffs and the Class seek restitution of the benefits unjustly obtained by ElevenLabs, including disgorgement of profits, an accounting of all revenues and benefits derived from ElevenLabs' unauthorized use of their voice

data and biometric identifiers, and such other equitable relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, respectfully request that this Court enter judgment against Defendant Eleven Labs Inc. and award the following relief:

A. *Injunctive Relief.* Permanently enjoin ElevenLabs, its officers, directors, employees, agents, affiliates, successors, assigns, and all persons acting in concert with them, and award such further injunctive and equitable relief as is necessary to remediate the conduct alleged in this Complaint, including the following:

(1) Cease, with respect to natural persons whose voice recordings were produced or recorded in Illinois, the collection, capture, purchase, receipt through trade, or other obtaining of voiceprints or biometric information without first providing the written notice of the specific purpose and duration of collection and obtaining the written release that 740 ILCS 14/15(b) requires;

(2) Cease the commercial use, sale, lease, trade, profiting from, dissemination, or other commercial exploitation of voiceprints and biometric information of Plaintiffs and Class members that ElevenLabs has already collected without BIPA-compliant consent;

(3) Identify and disclose, by name or other identifying information, the sources of all voice training data — including individual

98

recordings, source platforms, source URLs, dataset names and versions, licensors, and source-attributed metadata — used to develop, train, fine-tune, evaluate, or operate ElevenLabs' foundational voice synthesis models, including without limitation Eleven English v1, Eleven Multilingual v1 and v2, Eleven Flash v2 and v2.5, Eleven Turbo v2 and v2.5, and Eleven v3, together with any successor or derivative models;

(4)     Develop, implement, and make publicly available a written retention and destruction policy applicable to voiceprints and biometric information obtained from non-user training-data subjects, in compliance with 740 ILCS 14/15(a), and establish a publicly accessible mechanism through which non-user training-data subjects may request access to, correction of, or deletion of their biometric data and may verify whether their biometric data is in ElevenLabs' possession;

(5)     Destroy all voiceprints and biometric information of Plaintiffs and Class members that ElevenLabs obtained without BIPA-compliant consent, including all copies retained in training-data caches, fine-tuning datasets, evaluation corpora, model checkpoints, and downstream inference systems, and certify the destruction;

(6)     Destroy or retrain, without the unlawfully obtained voiceprints and biometric information, the foundational voice synthesis models — and the downstream commercial products built on those models — in which the unlawfully obtained voiceprints and biometric information are encoded, including without limitation Eleven English v1, Eleven Multilingual v1 and v2,

99

Eleven Flash v2 and v2.5, Eleven Turbo v2 and v2.5, Eleven v3, the default voice library distributed through ElevenLabs' platform, and the commercial products built on those models, including text-to-speech, Instant Voice Cloning, Professional Voice Cloning, AI Dubbing, Voice Design, Conversational AI, audiobook generation, the Iconic Marketplace, and the API and Studio products, together with any iterative or successor models trained from those models or derived from voiceprints or biometric information encoded in them; and require ElevenLabs to take all reasonable measures, including contractual takedown demands and termination of downstream license rights, to recall and remove the unlawfully encoded model parameters from sub-licensees, affiliates, vendors, processors, and other third parties to whom ElevenLabs has transmitted those parameters;

(7) Cease the use of Plaintiffs' and Class members' identities, including their voices, for commercial purposes without prior written consent, in violation of 765 ILCS 1075/30(a), and cease the distribution, transmission, or making available of sound recordings or audiovisual works containing unauthorized digital replicas of Plaintiffs' and Class members' voices, in violation of 765 ILCS 1075/30 as amended by P.A. 103-836 effective January 1, 2025, including by implementing technical and operational controls within ElevenLabs' Voice Cloning, Voice Design, AI Dubbing, and Conversational AI products to prevent the generation of unauthorized digital replicas of identifiable individuals; and

100

(8)      Provide adequate consumer-facing disclosure that voice outputs generated by ElevenLabs' commercial voice products are AI-generated, that the foundational voice synthesis models that produce those outputs were developed using voice recordings of speakers whose identities ElevenLabs has not disclosed, and that the individuals whose vocal characteristics are reproduced have not, except where licensed through the Iconic Marketplace or other BIPA-compliant written-consent program, authorized the use of their voices.

B.      *BIPA Damages.* Award each Class member, on each statutory subsection for which Defendant is found liable, the greater of liquidated damages or actual damages on a per-person, per-subsection basis consistent with 740 ILCS 14/20 as amended and as construed in *Clay v. Union Pacific Railroad Co.*, No. 25-2185 (7th Cir. Apr. 1, 2026), in the amount of $1,000 per negligent violation or $5,000 per intentional or reckless violation.

C.      *IRPA Damages.* Award the actual damages Plaintiffs and Class members sustained as a result of ElevenLabs' unauthorized commercial use of their identities, including their voices; the profits ElevenLabs earned from that unauthorized use to the extent not taken into account in computing actual damages; the statutory minimum of $1,000 per violation under 765 ILCS 1075/40 where actual damages are less than that amount; and punitive damages where ElevenLabs' violations are found to be willful.

D.     *ICFA Damages.* Award the actual economic damages Plaintiffs and Class members sustained as a result of ElevenLabs' unfair and deceptive practices, and punitive damages as permitted by 815 ILCS 505/10a.

E.     *Restitution and Disgorgement.* Order restitution of the benefits ElevenLabs has unjustly obtained from the unauthorized collection and commercial exploitation of Plaintiffs' and Class members' voiceprints, biometric information, and vocal identities; disgorgement of the profits ElevenLabs has earned through the integrated commercial chain alleged in this Complaint, including without limitation revenue from (i) ElevenLabs' free, Starter, Creator, Pro, Scale, and Enterprise subscription tiers; (ii) ElevenLabs' API usage and developer-tier fees; (iii) ElevenLabs' Iconic Marketplace licensing revenue and revenue-share arrangements with rights-holders; (iv) ElevenLabs' audiobook generation and distribution products, including direct distribution to Spotify, InAudio, and ElevenReader and the associated royalty arrangements; (v) ElevenLabs' Conversational AI, voice agent, and enterprise-deployment contracts; and (vi) ElevenLabs' AI dubbing, Voice Design, Voice Cloning, and other commercial voice products whose commercial value is constituted by the voiceprints embedded in the underlying foundational models; and an accounting of all such revenues and benefits.

F.     *Non-Duplication of Recovery.* Plaintiffs do not seek duplicative recovery across Counts. To the extent a particular harm is compensated under one Count, Plaintiffs do not seek to recover the same harm under another Count. Plaintiffs' claims for the same conduct under multiple statutes and

theories are pleaded in the alternative pursuant to Federal Rule of Civil Procedure 8(d)(2)–(3); the Court may award the relief that, in its judgment, makes Plaintiffs and Class members whole and addresses the unlawful conduct.

G. *Class Certification.* Certify the Class as defined in this Complaint pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3); appoint Plaintiffs as Class Representatives; and appoint Plaintiffs' counsel as Class Counsel.

H. *Judgment.* Enter judgment in favor of Plaintiffs and all Class members and against Defendant Eleven Labs Inc. on all Counts on which Defendant is found liable.

I. *Attorneys' Fees and Costs.* Award reasonable attorneys' fees, costs, and litigation expenses under 740 ILCS 14/20 (BIPA), 765 ILCS 1075/55 (IRPA), 815 ILCS 505/10a (ICFA), and 815 ILCS 510/3 (IUDTPA, upon a finding of willfulness), and under any other applicable fee-shifting provision.

J. *Interest.* Award pre-judgment and post-judgment interest at the maximum rate permitted by law, including the rate available under 815 ILCS 205/2 for pre-judgment interest where applicable.

K. *Further Relief.* Award such other and further relief as the Court deems just, equitable, and proper.

## JURY TRIAL REQUESTED

Plaintiffs, individually and on behalf of all other Class members, request a trial by jury on all claims so triable.

Dated: May 11, 2026

LOEVY & LOEVY

/s/ Ross Kimbarovsky

_____

Ross Kimbarovsky (6229590)
ross@loevy.com
Jon Loevy (6218524)
jon@loevy.com
Michael Kanovitz (6275233)
mike@loevy.com
Matthew Topic (6290923)
matt@loevy.com
Aaron Tucek (98624)
aaron@loevy.com
LOEVY & LOEVY
311 North Aberdeen, 3rd Floor
Chicago, IL 60607
312.243.5900 (phone)
312.243.5902 (fax)

*Attorneys for Plaintiffs Robin Amer, Carol Marin, Philip Rogers, Alison Flowers, Lindsey Dorcus, Yohance Lacour, and Victoria Nassif.*