**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ROBIN AMER, CAROL MARIN, PHILIP ROGERS, ALISON FLOWERS, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated,

Plaintiffs,

v.

ELEVEN LABS INC., a Delaware corporation,

Defendant.

Case No. 26-cv-05437

District Judge Steven C. Seeger

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT ELEVEN LABS INC.'S MOTION TO DISMISS**

# TABLE OF CONTENTS

Page


INTRODUCTION ....................1

FACTUAL BACKGROUND ....................3

LEGAL STANDARD ....................5

ARGUMENT ....................6

I. PLAINTIFFS' BIPA CLAIMS FAIL ....................6

A. Plaintiffs Do Not Plead Facts Plausibly Showing That ElevenLabs Collected Or Possessed Their "Voiceprints" ....................6

1. Plaintiffs Do Not Plausibly Allege That ElevenLabs Used *Their* Particular Voices To Train The Challenged AI Models ....................7

2. Plaintiffs Do Not Plausibly Allege That, If ElevenLabs Used Their Voice Recordings, It Transformed Them Into BIPA-Protected "Voiceprints" Capable Of Identifying Them ....................9

B. Plaintiffs Impermissibly Seek To Apply BIPA Extraterritorially....................11

C. Plaintiffs' BIPA Claims Suffer From Additional, Claim-Specific Defects ....................14

1. Plaintiffs Lack Standing To Pursue Their Section 15(a) Claim ....................14

2. Plaintiffs' Section 15(c)-(e) Claims Fail Because They Do Not Plausibly Allege That ElevenLabs Encodes Voiceprints In The Relevant Models Or Makes The Models Available To Anyone....................15

II. PLAINTIFFS' IRPA CLAIMS FAIL ....................16

A. Plaintiffs Fail To Plausibly Allege That ElevenLabs Used Their Identities For A "Commercial Purpose" Under Section 30(a) ....................17

B. Plaintiffs Fail To State A Section 30(b) Or 30(d) "Digital Replica" Claim ....................19

III. PLAINTIFFS' ICFA CLAIMS FAIL ....................21

A. Plaintiffs Fail To State An ICFA Deception Claim ....................22

1. Plaintiffs Fail To Allege A Deceptive Statement ....................22

2. Plaintiffs Do Not Plausibly Allege Proximate Cause ....................24

B. Plaintiffs Fail To State An ICFA Unfairness Claim ....................25

1. Plaintiffs Fail To Plead An Unfair Practice ....................26

2. Plaintiffs Fail To Plead Proximate Cause ....................27

IV. PLAINTIFFS' IUDTPA CLAIM FAILS ....................27

V. PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS ....................30

CONCLUSION ....................30

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Anderson v. Stability AI Ltd.*,
700 F. Supp. 3d 853 (N.D. Cal. 2023) ....9

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....5, 6, 11

*ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*,
282 F. Supp. 3d 1043 (N.D. Ill. 2017) ....29

*Atkins v. City of Chicago*,
631 F.3d 823 (7th Cir. 2011) ....8

*Avery v. State Farm Mut. Auto. Ins. Co.*,
835 N.E.2d 801 (Ill. 2005) ....12, 22

*Bartnett v. Abbott Lab'ys*,
492 F. Supp. 3d 787 (N.D. Ill. 2020) ....22

*Batson v. Live Nation Ent., Inc.*,
2013 WL 992641 (N.D. Ill. Mar. 13, 2013), *aff'd*, 746 F.3d 827 (7th Cir. 2014) ....26

*Batson v. Live Nation Ent., Inc.*,
746 F.3d 827 (7th Cir. 2014) ....26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....5, 9

*Bogie v. Rosenberg*,
705 F.3d 605 (7th Cir. 2013) ....28

*Brantley v. Prisma Labs, Inc.*,
2024 WL 3673727 (N.D. Ill. Aug. 6, 2024) ....9

*Brownmark Films, LLC v. Comedy Partners*,
682 F.3d 687 (7th Cir. 2012) ....22

*Camasta v. Jos. A. Bank Clothiers, Inc.*,
761 F.3d 732 (7th Cir. 2014) ....21

*Carpenter v. McDonald's Corp.*,
580 F. Supp. 3d 512 (N.D. Ill. 2022) ....12

*Connick v. Suzuki Motor Co.*,
675 N.E.2d 584 (Ill. 1996) ....................20

*Craw v. Clorox Co.*,
692 F. Supp. 3d 854 (C.D. Ill. 2023) ....................22

*D'Ambrosio v. Meta Platforms, Inc.*,
176 F.4th 928 (7th Cir. 2026) ....................18

*Darne v. Ford Motor Corp.*,
2017 WL 3836586 (N.D. Ill. Sep. 1, 2017) ....................23

*Davis v. e.l.f. Cosms., Inc.*,
2024 WL 2722663 (N.D. Ill. May 28, 2024) ....................13, 15

*Davis v. G.N. Mortg. Corp.*,
396 F.3d 869 (7th Cir. 2005) ....................23

*Dobrowolski v. Intelius, Inc.*,
2017 WL 3720170 (N.D. Ill. Aug. 29, 2017) ....................17

*Fox v. Dakkota Integrated Sys., LLC*,
980 F.3d 1146 (7th Cir. 2020) ....................15

*Geske v. PNY Techs., Inc.*,
503 F. Supp. 3d 687 (N.D. Ill. 2020) ....................23

*Guajardo v. Skechers USA, Inc.*,
503 F. Supp. 3d 746 ....................23, 24

*Hogan v. Amazon.com, Inc.,*
2022 WL 952763 (N.D. Ill. Mar. 30, 2022) ....................7

*Huston v. Hearst Commc'ns, Inc.*,
53 F.4th 1097 (7th Cir. 2022) ....................16, 18

*In re Google Generative AI Copyright Litig.*,
809 F. Supp. 3d 903 (N.D. Cal. 2025) ....................9

*In re Mosaic LLM Litig.*,
2025 WL 2402677 (N.D. Cal. Aug. 19, 2025) ....................9

*In re Text Messaging Antitrust Litig.*,
630 F.3d 622 (7th Cir. 2010) ....................8

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
589 U.S. 178 (2020) ....................20

*Kadrey v. Meta Platforms, Inc.*,
2023 WL 8039640 (N.D. Cal. Nov. 20, 2023) ....................16, 20

*Kahn v. Walmart Inc.*,
107 F.4th 585 (7th Cir. 2024) ....................22, 27

*Lawrence v. Trax Recs., Inc.*,
2025 WL 919616 (N.D. Ill. Mar. 26, 2025)....................28

*Love v. Simmons*,
2024 WL 809107 (N.D. Ill. Feb. 27, 2024) ....................30

*Lynch Ford, Inc. v. Ford Motor Co.*,
957 F. Supp. 142 (N.D. Ill. 1997) ....................28

*MacLeod v. ComEd*,
248 N.E.3d 1133 (Ill. App. 2024) ....................25, 27

*Martell v. X Corp.*,
2024 WL 3011353 (N.D. Ill. June 13, 2024) ....................6, 10

*McGoveran v. Amazon Web Servs., Inc.*,
2021 WL 4502089 (D. Del. Sep. 30, 2021) ....................12, 13

*McGoveran v. Amazon Web Servs., Inc.*,
2024 WL 4626253 (D. Del. Oct. 30, 2024), *aff'd* 175 F.4th 434 (3d Cir. 2026)....................12

*McGoveran v. Amazon Web Servs., Inc.*,
175 F.4th 434 (3d Cir. 2026) ....................13

*Mercis, B.V. v. Individuals*,
2025 WL 540509 (N.D. Ill. Feb. 19, 2025) ....................29

*Mosley v. Gen. Revenue Corp.*,
2020 WL 4060767 (C.D. Ill. July 20, 2020)....................11

*Perdue v. Hy-Vee, Inc.*,
455 F. Supp. 3d 749 (C.D. Ill. 2020) ....................30

*Praither v. Northbrook Bank & Tr. Co.*,
192 N.E.3d 747 (Ill. App. 2021) ....................20

*Ramirez v. LexisNexis Risk Sols.*,
729 F. Supp. 3d 838 (N.D. Ill. 2024) ....................25

*Rivera v. Google Inc.*,
238 F. Supp. 3d 1088 (N.D. Ill. 2017) ....................11, 12, 16

*Roake v. Forest Pres. Dist. of Cook Cnty.*,
849 F.3d 342 (7th Cir. 2017) ....................................................5, 7

*Siegel v. Shell Oil Co.*,
612 F.3d 932 (7th Cir. 2010) ....................................................26

*Speakers of Sport, Inc. v. ProServ, Inc.*,
178 F.3d 862 (7th Cir. 1999) ....................................................27

*Strautins v. Trustwave Holdings, Inc.*,
27 F. Supp. 3d 871 (N.D. Ill. 2014) ....................................................9

*Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*,
241 N.E.3d 454 (Ill. 2024) ....................................................21, 24

*Vance v. Google*,
2024 WL 1141007 (N.D. Ill. Mar. 15, 2024) ....................................................12

*Vance v. Microsoft Corp.*,
2022 WL 9983979 (W.D. Wash. Oct. 17, 2022) ....................................................12

*Vanzant v. Hill's Pet Nutrition, Inc.*,
934 F.3d 730 (7th Cir. 2019) ....................................................21, 24, 30

*Watts v. Emergency Twenty Four, Inc.*,
2021 WL 2529613 (N.D. Ill. June 21, 2021) ....................................................11

*Woodland v. Hill*,
136 F.4th 1199 (9th Cir. 2025) ....................................................8

*Zellmer v. Meta Platforms, Inc.*,
104 F.4th 1117 (9th Cir. 2024) ....................................................10

**STATUTES**

740 ILCS
14/10 ....................................................1, 6, 10
14/15(a) .................................................... *passim*
14/15(b) ....................................................12
14/15(c) ....................................................13, 15
14/15(d) ....................................................13, 15
14/15(e) ....................................................5, 14

765 ILCS
1075/5 ....................17, 18, 19, 20
1075/30 ....................18
1075/30(a) ....................2, 17
1075/30(b) ....................2, 17, 19, 20, 21
1075/30(d) ....................2, 17, 19, 20, 21

815 ILCS
505/2 ....................21
510/2(a)(2) ....................27
510/2(a)(3) ....................27
510/3 ....................28

**RULES**

Rule
8(a) ....................28
9(b) ....................21, 28
12(b)(6) ....................5

**OTHER AUTHORITIES**

Audible, *Learn about the Audible Standard Membership*, https://help.audible.com/s/article/learn-about-standard-plan?language=en_US (last visited Aug. 17, 2026) ....................8

ElevenLabs, *$22 million earned by voice creators on ElevenLabs*, https://elevenlabs.io/blog/22-million-earned-by-voice-creators-on-elevenlabs (last visited Aug. 17, 2026) ....................3

ElevenLabs, Impact Healthcare, https://elevenlabs.io/impact-healthcare (last visited Aug. 17, 2026) ....................3

ElevenLabs, Professional Voice Cloning, https://elevenlabs.io/docs/eleven-creative/voices/voice-cloning/professional-voice-cloning (last visited Aug. 17, 2026) ....................20

ElevenLabs, Safety, https://elevenlabs.io/safety (last visited Aug. 17, 2026) ....................4

ElevenLabs, Text to Speech, https://elevenlabs.io/text-to-speech (last visited Aug. 17, 2026) ....................3

ElevenLabs, Voice Cloning, https://elevenlabs.io/voice-cloning (last visited Aug. 17, 2026) ....................3

No. Public Access 17-011, 2017 WL 10084298 (Ill. A.G. Aug. 14, 2017) ....................6

Spotify, *Audiobooks in Premium: Get lost in great stories*,
https://www.spotify.com/us/audiobooks (last visited Aug. 17, 2026)........................................8

## INTRODUCTION

Eleven Labs Inc. ("ElevenLabs") is a pioneering artificial intelligence ("AI") research and product company that transforms how people and businesses communicate with their customers, employees, and the world. ElevenLabs has developed foundational AI voice and audio models, which are used to power its products. Plaintiffs are seven journalists and audiobook narrators who claim to make a living using their voices. Notably, Plaintiffs are not users of ElevenLabs' products. And they do not plausibly allege that their voices were generated as outputs of ElevenLabs' products or that anyone was deceived into believing that any voice output was one of their voices. Without those facts to go on, Plaintiffs retreat to claiming that ElevenLabs unlawfully used their voices as *inputs* to train its AI models. But their entire case is premised on speculative assertions, conclusory allegations, and strained legal theories. Accordingly, their nine claims—for violations of the Illinois Biometric Information Privacy Act ("BIPA"), the Illinois Right of Publicity Act ("IRPA"), the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), and the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), and for common law unjust enrichment—should be dismissed.

*First*, Plaintiffs fail to state a BIPA claim. Plaintiffs allege that ElevenLabs' use of their voices to train its AI models violates Sections 15(a) through 15(e) of BIPA, which impose requirements on private entities that collect or possess "biometric identifier[s]" (including "voiceprint[s]") and "[b]iometric information." 740 ILCS 14/10. But Plaintiffs' allegations rely on two speculative assumptions. They posit that because their voices are "distinguished in their fields" and available on publicly accessible platforms, Dkt. 1 ¶ 2, ElevenLabs *must* have trained its AI models on each of *their* voices. Plaintiffs then speculate that ElevenLabs converted Plaintiffs' voice recordings into BIPA-protected voiceprints that are capable of identifying them, without pleading any facts to support that conclusion or any reason for ElevenLabs to do so.

Indeed, Plaintiffs elsewhere concede that ElevenLabs does "not know which biometric data it possesses[] [and] which data subjects that data pertains to." *Id.* ¶ 170. Each is an independent reason to dismiss. Plaintiffs' BIPA claims also fail because Plaintiffs impermissibly seek to apply BIPA extraterritorially; lack standing to pursue their Section 15(a) claim; and, as to their Section 15(c), (d), (e) claims, do not plausibly allege that ElevenLabs encoded their voiceprints in the relevant models or made the models available to anyone.

*Second*, Plaintiffs fail to state an IRPA claim. Plaintiffs allege that by using their voices "to develop, train, and operate" its AI models, ElevenLabs "h[eld] out [Plaintiffs'] identity" to advertise its products, in violation of IRPA Section 30(a). *Id.* ¶ 182; *see* 765 ILCS 1075/30(a). But Plaintiffs offer no plausible allegations that ElevenLabs held out Plaintiffs' identities, much less for a commercial purpose. Plaintiffs further allege that by making available its voice products, ElevenLabs "distribut[ed] … a sound recording … with actual knowledge that [it] contains an unauthorized digital replica," in violation of IRPA Sections 30(b) and (d). Dkt. 1 ¶¶ 183-185; *see* 765 ILCS 1075/30(b), (d). But Plaintiffs do not identify any "recording[] that is a digital replica" of any Plaintiff's voice, much less plausibly allege that ElevenLabs distributed such recording with "actual knowledge that [it] contains an unauthorized digital replica" of any of their voices.

*Third*, Plaintiffs fail to state an ICFA claim. ICFA protects a "reasonable consumer" from "deceptive" and "unfair" acts. Plaintiffs do not allege they are consumers of ElevenLabs' products, and they identify no deceptive statement or unfair act by ElevenLabs. Further, Plaintiffs do not allege that ElevenLabs proximately caused their injuries, as the disclosures Plaintiffs seek would not cure their purported harm.

*Fourth*, Plaintiffs' IUDTPA claim fares no better. IUDTPA prohibits conduct that creates a likelihood of confusion as to a product's source, sponsorship, or affiliation. Plaintiffs do not

plausibly allege that ElevenLabs created any confusion in the marketplace and merely speculate that consumers might be confused. Plaintiffs also fail to allege that they are likely to be damaged by ElevenLabs' conduct or that the requested injunction would protect against their claimed harm.

*Finally*, Plaintiffs' unjust enrichment claim should be dismissed because it rises and falls with the other causes of action. The Complaint should be dismissed in its entirety.

## FACTUAL BACKGROUND

ElevenLabs is an AI research and product company that transforms how people and businesses communicate with their customers, employees, and the world. ElevenLabs has developed foundational AI voice and audio models that power its commercial products. Dkt. 1 ¶¶ 33-34. Its text-to-speech products generate speech in over 70 languages and can be used for a wide variety of purposes, including to create voices for voice agents that provide customer or citizen support or to make books, articles, and other content accessible to anyone via audio. *Id.* ¶ 34; *see, e.g.*, ElevenLabs, Text to Speech, https://elevenlabs.io/text-to-speech (last visited Aug. 17, 2026). Other ElevenLabs products permit users to create replicas of their *own* voices and can be used by content creators to scale their production and reach a global audience by generating voiceovers in their own voices in numerous languages, and by individuals who have lost their voice due to illness or accident. Dkt. 1 ¶ 34; *see* ElevenLabs, Voice Cloning, https://elevenlabs.io/voice-cloning (last visited Aug. 17, 2026); ElevenLabs, Impact Healthcare, https://elevenlabs.io/impact-healthcare (last visited Aug. 17, 2026). ElevenLabs' Voice Library allows professional and amateur voice actors to generate passive income from the use of their voice within parameters set by them; ElevenLabs has paid voice actors more than $22 million since launching the marketplace. *See* ElevenLabs, *$22 million earned by voice creators on ElevenLabs*, https://elevenlabs.io/blog/22-million-earned-by-voice-creators-on-elevenlabs (last visited Aug. 17, 2026). ElevenLabs has developed cutting-edge guardrails to ensure the responsible and safe

use of its products. *See* ElevenLabs, Safety, https://elevenlabs.io/safety (last visited Aug. 17, 2026). And ElevenLabs abides by privacy laws with respect to its users' voice data by "operat[ing] a platform user consent regime." Dkt. 1 ¶¶ 109-110.

Plaintiffs are seven Illinois residents who work in journalism and audiobook narration. *Id.* ¶ 2. They are not users of ElevenLabs products. *Id.* ¶¶ 56-57. They also do not plausibly allege that ElevenLabs reproduced or otherwise generated their voices as outputs of its products or that anyone was confused into believing that ElevenLabs' products were reproducing their voices. Instead, they speculate that ElevenLabs used their voices, along with many others, *id.* ¶¶ 8, 119, as inputs to *train* its AI models, which are then used in its various products. Specifically, Plaintiffs allege, "[o]n information and belief," that ElevenLabs trained its AI models "primarily" on "publicly distributed long-form audio recordings of identifiable individual speakers on third-party platforms," as well as on "podcasts, broadcast journalism, audio drama, and other narrative voice content distributed through major hosting and discovery platforms" and "pre-packaged, third-party anonymized datasets." *Id.* ¶¶ 51-52; *see also id.* ¶ 54. Plaintiffs further allege that they have recorded "long-form, single-speaker, studio-quality audio" and that their recordings are publicly available on various major platforms like Spotify, Apple Podcasts, Audible, and/or YouTube. *Id.* ¶ 94. From this, Plaintiffs speculate that, out of the hundreds of thousands of "long-form, single-speaker, studio-quality audio" publicly available on these and other platforms, ElevenLabs must have trained its AI models using *Plaintiffs'* recordings. *Id.* ¶¶ 54, 94.

Plaintiffs further speculate that, in training its AI models, ElevenLabs transformed Plaintiffs' voice recordings into biometric "voiceprints." They allege that ElevenLabs "necessarily" "identifie[d] the acoustic features that distinguish individual voices from one another" and "encode[d] those features as mathematical representations stored in the parameters

of the trained model." *Id.* ¶¶ 39, 45; *see id.* ¶¶ 42, 44. Plaintiffs then allege these "voiceprints" are "embedded in or operationalized through [ElevenLabs'] models," such that the "voiceprint" and ElevenLabs' "product[s] are the same thing." *Id.* ¶¶ 54, 150. On these allegations, Plaintiffs claim that ElevenLabs violated Sections 15(a)-(e) of BIPA. *See id.* ¶¶ 130-177 (Counts I-V).

Plaintiffs also allege that ElevenLabs violated Section 30(a) of IRPA by using their voices to "develop, train, and operate" its AI models, which power its commercial products, and violated Sections 30(b) and (d) of IRPA because its commercial products generate "digital replicas" of their voices. *Id.* ¶¶ 178-190 (Count VI). They allege that ElevenLabs violated ICFA by "collecting, extracting, and commercially exploiting [Plaintiffs'] biometric identifiers and biometric information" in connection with "marketing, offering, and distributing [its] voice synthesis products and services." *Id.* ¶¶ 191-202 (Count VII). And they allege that ElevenLabs violated IUDTPA by failing to disclose to consumers that its products' "voice outputs" are AI generated and built without necessary authorization. *Id.* ¶¶ 203-208 (Count VIII). Plaintiffs also bring an unjust enrichment claim, theorizing that ElevenLabs unjustly benefited at their expense through its alleged use of their "voice recordings, voiceprints, biometric information, and associated identity attributes without permission and without compensation." *Id.* ¶¶ 209-214 (Count IX).

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must state a claim that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Because this standard demands "more than a sheer possibility that a defendant has acted unlawfully," a complaint must plead facts that are more than "'merely consistent with' a defendant's liability." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In assessing plausibility, only "well-pleaded factual allegation[s]" are "entitled to a presumption of truth." *Roake v. Forest Pres. Dist. of Cook Cnty.*, 849 F.3d 342, 347 n.4 (7th Cir. 2017). A complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further

factual enhancement.'" *Iqbal*, 556 U.S. at 678 (alteration in original) (citation omitted).

## ARGUMENT

### I. PLAINTIFFS' BIPA CLAIMS FAIL

Multiple, independent defects doom Plaintiffs' BIPA claims. Plaintiffs do not plausibly allege that ElevenLabs (1) trained the relevant AI models on *their* voices or (2) extracted and retained BIPA-protected "voiceprints" in the process. Plaintiffs also impermissibly seek to apply BIPA extraterritorially. On top of those cross-cutting (and dispositive) flaws, Plaintiffs' claims under Sections 15(a), (c), (d), and (e) suffer from other claim-specific defects.

#### A. Plaintiffs Do Not Plead Facts Plausibly Showing That ElevenLabs Collected Or Possessed Their "Voiceprints"

Plaintiffs fail to state a BIPA claim. Section 15 imposes requirements on private entities that collect or possess "biometric identifier[s]"—defined to include "voiceprint[s]"—and "[b]iometric information," which is "information … based on an individual's biometric identifier used to identify an individual." 740 ILCS 14/10. BIPA does not define the term "voiceprint," but as the Illinois Attorney General has explained, a voiceprint is "a record of mechanical measurement" that "is not the same as a simple recording of a voice." No. Public Access 17-011, 2017 WL 10084298, at *3 (Ill. A.G. Aug. 14, 2017). Additionally, under BIPA, "Plaintiff[s] must allege that the biometric identifier[s]" at issue—here, alleged voiceprints—"can be used to identify an individual." *Martell v. X Corp.*, 2024 WL 3011353, at *3 (N.D. Ill. June 13, 2024).

Plaintiffs' BIPA claims all rest on the premise that ElevenLabs collected or possessed their "voiceprints" and/or "biometric information" derived from their voiceprints. Dkt. 1 ¶¶ 134, 141, 149, 157, 169. That theory of BIPA liability requires layering one implausible assumption atop another: (1) that, out of *all* the voice recordings available to ElevenLabs, ElevenLabs trained its AI models on recordings of *these* seven Plaintiffs; and (2) that ElevenLabs transformed those

recordings into BIPA-protected "voiceprints" capable of identifying the original speaker, despite having no reason to do so. Plaintiffs' BIPA claims fail because they do not plead facts supporting either link in that speculative chain. *See Roake*, 849 F.3d at 347 & n.4 (declining to credit plaintiff's "conclusory and hypothetical assertion" and affirming dismissal where he "allege[d] no facts" supporting an element of liability).

### 1. Plaintiffs Do Not Plausibly Allege That ElevenLabs Used *Their* Particular Voices To Train The Challenged AI Models

Dismissal is warranted when BIPA plaintiffs fail to plausibly allege that their own voices were used to improve a defendant's technology. In *Hogan v. Amazon.com, Inc.*, the court granted dismissal where plaintiffs did "not plead facts to show that their images were specifically used to better the [facial recognition] technology or make it more marketable." 2022 WL 952763, at *7 (N.D. Ill. Mar. 30, 2022). As in *Hogan*, Plaintiffs' BIPA claims stumble because they do not plead facts indicating that ElevenLabs trained the challenged models on recordings of *their* voices.

Plaintiffs assert that ElevenLabs trained its models on recordings from various sources, including "long-form audio recordings," "other narrative voice content distributed through major hosting and discovery platforms," and "pre-packaged third-party, anonymized datasets." Dkt. 1 ¶¶ 51-52; *see id.* ¶ 54. But Plaintiffs do not plausibly allege that ElevenLabs used any specific dataset containing their voice recordings. Instead, Plaintiffs posit that because high-quality recordings of their voices exist on publicly accessible platforms, and because ElevenLabs (and other companies) trained AI models on audio from "the same categories" of publicly accessible platforms, the challenged models must have trained on Plaintiffs' voices. *Id.* ¶¶ 54, 69, 74, 79, 84, 89, 94, 99, 120. Plaintiffs offer no facts to support (or even reason to think) that ElevenLabs used recordings of *their* voices among the countless other "long-form," "single, consistent speaker" "professionally produced studio-quality audio" available publicly and to ElevenLabs. *Id.* ¶ 54(b).

They offer no reason why ElevenLabs was more likely to train its AI models using recordings from the platforms that host any of the seven Plaintiffs' works—much less each Plaintiff's works. *Compare id.* ¶ 88 (alleging Plaintiff Rogers' work is available on NBC Chicago's digital platform and YouTube), *with id.* ¶ 98 (alleging Plaintiff Nassif's work is available on Audible, AppleBooks, Spotify, and "other major audiobook retailers"—but not NBC Chicago and YouTube). Nor do they offer any reason why ElevenLabs was more likely to use *their* recordings rather than the hundreds of thousands of other recordings available on these platforms.[1]

Although Plaintiffs allege that their "recorded voices are among the most distinguished in their fields," *id.* ¶ 2, they do not explain why this would make it more likely that ElevenLabs trained its models on their voices. Plaintiffs do not allege, for example, that ElevenLabs trained or needed to train its models using the voices of only well-known individuals or that ElevenLabs, or any of the platforms from which it allegedly downloaded recordings, has the capability of downloading only well-known voices. Given the vast quantity of audio available on the internet and elsewhere, the odds that Plaintiffs' specific voices were used is infinitesimal—far from the kind of well-pleaded factual allegation necessary to survive dismissal. *See Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011) ("[T]he complaint taken as a whole must establish a nonnegligible probability that the claim is valid, though it need not be so great a probability as such terms as 'preponderance of the evidence' connote."); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) ("The fact that the allegations undergirding a claim *could* be true is no longer enough to save a complaint from being dismissed." (emphasis added)); *Woodland*

---

[1] *See, e.g.*, Audible, *Learn about the Audible Standard Membership*, https://help.audible.com/s/article/learn-about-standard-plan?language=en_US (last visited Aug. 17, 2026) (indicating Audible's collection of audiobooks includes one million titles); Spotify, *Audiobooks in Premium: Get lost in great stories*, https://www.spotify.com/us/audiobooks (last visited Aug. 17, 2026) (indicating Spotify's audiobook catalogue includes over 700,000 titles).

*v. Hill*, 136 F.4th 1199, 1209 (9th Cir. 2025) (concluding, in copyright infringement context, that allegation that "[defendant] uses Instagram and that [plaintiff's] photos are on Instagram raises no more than a 'bare possibility' that [defendant] viewed [plaintiff's] photos," given that "there are over a billion users and many more posts on Instagram").

Courts in this District have dismissed BIPA claims with similar deficiencies. In *Brantley v. Prisma Labs, Inc.*, for example, the court dismissed Section 15(b)-(d) claims where the plaintiffs failed to "plausibly allege that photos of Plaintiffs were contained in the [dataset defendant allegedly scraped] or that [defendant] used any of his information or photos." 2024 WL 3673727, at *5 (N.D. Ill. Aug. 6, 2024). In the analogous copyright context, courts routinely dismiss similarly speculative claims. *See, e.g.*, *In re Google Generative AI Copyright Litig.*, 809 F. Supp. 3d 903, 914 (N.D. Cal. 2025) (dismissing claim as to certain models given lack of specific allegations "that any of [plaintiffs'] works were included in training datasets used to develop the[] models"); *Anderson v. Stability AI Ltd.*, 700 F. Supp. 3d 853, 869 (N.D. Cal. 2023) (similar); *In re Mosaic LLM Litig.*, 2025 WL 2402677, at *2 (N.D. Cal. Aug. 19, 2025) (similar); *see also Strautins v. Trustwave Holdings, Inc.*, 27 F. Supp. 3d 871, 879-81 (N.D. Ill. 2014).

Ultimately, there is nothing to separate Plaintiffs from essentially anyone who has ever publicly posted their voice online, and nothing to "nudge[]" their allegations "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. Without plausible allegations "that any of their works were included in training datasets used to develop these models," Plaintiffs do not sufficiently allege that ElevenLabs trained its models on their voices. *In re Google Generative AI Copyright Litig.*, 809 F. Supp. 3d at 914. This Court should dismiss the BIPA claims.

#### 2. Plaintiffs Do Not Plausibly Allege That, If ElevenLabs Used Their Voice Recordings, It Transformed Them Into BIPA-Protected "Voiceprints" Capable Of Identifying Them

Even if Plaintiffs had plausibly alleged that their voices were used to train the relevant

models, their BIPA claims still go nowhere. That is because Plaintiffs do not, as they must, plead facts indicating that ElevenLabs transformed those recordings into BIPA-protected "voiceprints" capable of identifying the speaker.

There is "broad consensus that 'biometric identifiers' under BIPA must be able to identify," *Zellmer v. Meta Platforms, Inc.*, 104 F.4th 1117, 1123-25 (9th Cir. 2024), and the same holds for "[b]iometric information," 740 ILCS 14/10. That a voiceprint must be able to identify follows from "a plain reading" of the statute. *Martell*, 2024 WL 3011353, at *3. Plaintiffs do not resist that premise. *See* Dkt. 1 ¶ 3 ("A voiceprint … identifies the individual."). But they plead no facts explaining how—or why—any measurements ElevenLabs may have created from their voices would be capable of identifying them as the speaker. At most, Plaintiffs allege that their recordings are available on public platforms, "with metadata publicly identifying [them] by name." *Id.* ¶¶ 68, 73; *see also id.* ¶¶ 25-26, 53. But, crucially, they do not allege that ElevenLabs actually *collected* that metadata or *retained* it alongside the speaker-specific measurements it supposedly extracted from voice recordings. In fact, Plaintiffs concede that "ElevenLabs does not maintain a record identifying which voiceprints[] [or] biometric information … derive from which individual training-data subjects." *Id.* ¶ 170; *see also id.* (accusing ElevenLabs of "not know[ing] which biometric data it possesses[] [and] which data subjects that data pertains to").

The implausibility of Plaintiffs' voiceprint theory is underscored by the absence of any facts suggesting *why* ElevenLabs would collect or retain speaker-identifying data when training its models. In Plaintiffs' telling, ElevenLabs used their voices to train its AI models, which are in turn used in its commercial products "to generate realistic, expressive, and multilingual human-sounding voices." *Id.* ¶ 182. In other words, Plaintiffs allege that the models generate *new* audio, not that they recognize or identify Plaintiffs' voices. And they nowhere explain why

generating *new* audio would require the ability to recognize Plaintiffs' voices, which were allegedly used at the outset to train the model, or allege that any *new* audio actually generated can be used to identify Plaintiffs' voices. That critical omission warrants dismissal. *See Mosley v. Gen. Revenue Corp.*, 2020 WL 4060767, at *4 (C.D. Ill. July 20, 2020) (dismissing Telephone Consumer Protection Act ("TCPA") claim where plaintiff failed to offer sufficient reasons to make "the fact that the device used *might* have had the capability to use randomly generated number systems … more than a speculative possibility" (emphasis in original)).

Ultimately, "even though a plaintiff 'will rarely, if ever, know the specific functionality of a system used by a defendant' before discovery, the plaintiff must still allege sufficient facts to 'nudge' his claim 'across the line from conceivable to plausible.'" *Watts v. Emergency Twenty Four, Inc.*, 2021 WL 2529613, at *4-5 (N.D. Ill. June 21, 2021) (citation omitted) (dismissing TCPA claim). Bereft of facts that would make it plausible that ElevenLabs created BIPA-protected voiceprints capable of identifying a particular speaker, Plaintiffs' BIPA claims fail.

In short, Plaintiffs' speculative theory of BIPA liability fails at every step. They do not plausibly allege that ElevenLabs trained the challenged AI models on their specific voices. And they do not plausibly allege that, if such training occurred, ElevenLabs created BIPA-protected, speaker-identifying voiceprints in the process. At bottom, Plaintiffs' BIPA claims rest on bare "conclusions," "formulaic recitation[s]" of the statutory elements, and "naked assertion[s]." *Iqbal*, 556 U.S. at 678 (citations omitted). That "will not do." *Id.* (citation omitted).

### B. Plaintiffs Impermissibly Seek To Apply BIPA Extraterritorially

As an alternative ground for dismissal, Plaintiffs impermissibly seek to hold ElevenLabs liable for extraterritorial conduct. Because BIPA does not apply extraterritorially, *see Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1100 (N.D. Ill. 2017), Plaintiffs must show that "the circumstances that relate to the disputed transaction[s]"—here, their five "asserted violations" of

BIPA—"occur[red] primarily and substantially in Illinois." *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 854 (Ill. 2005); *see also Rivera*, 238 F. Supp. 3d at 1100; *Vance v. Microsoft Corp.*, 2022 WL 9983979, at *7 (W.D. Wash. Oct. 17, 2022). ElevenLabs is a Delaware corporation with its principal place of U.S. business in New York. Dkt. 1 ¶ 21. Plaintiffs do not allege that ElevenLabs collected, processed, or stored any biometric data in Illinois, and their residence in Illinois is not enough. *See Vance v. Google*, 2024 WL 1141007, at *3 (N.D. Ill. Mar. 15, 2024) (collecting cases). Because Plaintiffs do not plausibly allege that ElevenLabs' conduct "occur[red] primarily and substantially in Illinois," their BIPA claims should be dismissed.

**Section 15(b)**: Section 15(b) prohibits entities from "collect[ing], captur[ing], … or otherwise obtain[ing] a person's … biometric identifier or biometric information" without consent. 740 ILCS 14/15(b). Plaintiffs do not plead that "ElevenLabs collected, captured, and otherwise obtained" their biometric data in Illinois. Dkt. 1 ¶ 134. Rather, they claim only that their biometric data was of "Illinois-origin." *Id.* ¶ 27. But "a voiceprint … is not the same as a simple recording of a voice." *Carpenter v. McDonald's Corp.*, 580 F. Supp. 3d 512, 515 (N.D. Ill. 2022). Thus, merely alleging that recordings were first produced in Illinois, without alleging that the critical steps of ingesting the voice recording and extracting voiceprints from those recordings occurred in Illinois, does not center this claim in Illinois. *See Vance*, 2024 WL 1141007, at *3 (dismissing BIPA claim where "Plaintiffs do not allege that Google processes, stores, or otherwise makes use of the DiF Dataset (or any biometric data for that matter) in Illinois"); *McGoveran v. Amazon Web Servs., Inc.*, 2021 WL 4502089, at *4 (D. Del. Sep. 30, 2021) (dismissing BIPA claim where plaintiffs alleged only that their "voice audio was intercepted in Illinois," and not that "'voiceprints' were created, possessed, or stored in … Illinois"); *McGoveran v. Amazon Web Servs., Inc.*, 2024 WL 4626253, at *4 (D. Del. Oct. 30, 2024) (Bibas, J.) (similar, at summary

judgment), *aff'd* 175 F.4th 434 (3d Cir. 2026).

**Section 15(a)**: Section 15(a) requires entities in "possession of biometric identifiers or biometric information [to] develop" and "comply with" a retention policy. 740 ILCS 14/15(a). The conduct triggering that obligation is the "possession" of biometric identifiers or biometric information. Plaintiffs do not plead that ElevenLabs collected, possessed, or retained biometric data in Illinois, or even that it has any servers, storage centers, or any other infrastructure in Illinois. *See* Dkt. ¶¶ 141-142. Their Section 15(a) claim thus is impermissibly extraterritorial. *See McGoveran*, 175 F.4th at 442 ("Even if [Amazon] had stored biometric identifiers, it could not have done so in Illinois because the relevant servers were in Virginia.").

**Section 15(c)**: Section 15(c) prohibits entities in "possession of [] biometric information" from "sell[ing], leas[ing], trad[ing], or otherwise profit[ing] from a person's … biometric identifier or biometric information." 740 ILCS 14/15(c). Section 15(c) reaches only "commercial transactions where 'the access to biometric data is shared or given to another.'" *Davis v. e.l.f. Cosms., Inc.*, 2024 WL 2722663, at *8 n.4 (N.D. Ill. May 28, 2024). It does not reach the use of biometric data to improve technology, including through training. *See id* at *8 (allegations that defendant "profited from the capture of … biometric data because the [relevant tool] improved users' experience on the website, which le[d] to increased sales volume," do not state a Section 15(c) claim). Plaintiffs do not identify any "commercial transaction[]" in Illinois where ElevenLabs allegedly gave access to Plaintiffs' alleged biometric data to others.

**Section 15(d)**: Section 15(d) prohibits entities "in possession of a biometric identifier or biometric information [from] disclos[ing], redisclos[ing], or otherwise disseminat[ing]" that information. 740 ILCS 14/15(d). As explained, Plaintiffs do not plead that ElevenLabs possessed biometric data in Illinois. *See supra* at 12-13. While they plead that ElevenLabs "disclosed,

redisclosed, and otherwise disseminated" biometric data in three situations, they do not allege that any occurred in Illinois. Dkt. 1 ¶ 157. Nor do Plaintiffs allege that ElevenLabs (1) uses any Illinois-based "vendors and service providers," *id.* ¶ 158; (2) transmitted information to or through "affiliates, vendors, and processors" in Illinois, *id.* ¶ 159; or (3) transmitted biometric information to "recipients outside ElevenLabs' direct control" in Illinois, *id.* ¶ 160.

**Section 15(e)**: Section 15(e) requires entities "in possession of a biometric identifier or biometric information" to "store, transmit, and protect from disclosure" the information using reasonable care. 740 ILCS 14/15(e). The conduct that triggers one's obligation under Section 15(e) is "possession," and Plaintiffs do not plead that ElevenLabs "possess[ed]," "store[d]" or "transmit[ted]" biometric information in Illinois. Dkt. 1 ¶ 166; *see supra* at 12-13.

### C. Plaintiffs' BIPA Claims Suffer From Additional, Claim-Specific Defects

Beyond these cross-cutting, fatal defects, Plaintiffs' BIPA claims suffer from other claim-specific flaws. Plaintiffs lack standing to pursue their Section 15(a) claim. And their claims under Sections 15(c), (d), and (e) fail because they rest on the premise that merely using the challenged models or disclosing a model's "parameters" uses or discloses BIPA-protected voiceprints—a premise that Plaintiffs do not plausibly allege.

#### 1. Plaintiffs Lack Standing To Pursue Their Section 15(a) Claim

Plaintiffs' Section 15(a) claim alleges only that "ElevenLabs has not developed and made publicly available a retention and destruction policy applicable to voiceprints and biometric information extracted from non-user training-data subjects." Dkt. 1 ¶ 142. Section 15(a) generally requires covered private entities to develop and comply with "a written policy, made available to the public, establishing a retention schedule and guidelines for permanently destroying" biometric data. 740 ILCS 14/15(a). But failing to develop and disclose a retention schedule are duties "owed to the public generally" that, without more, do not create the kind of "particularized harm" required

to support standing for a Section 15(a) claim. *Fox v. Dakkota Integrated Sys., LLC*, 980 F.3d 1146, 1154 (7th Cir. 2020) (citation omitted). Because Plaintiffs allege "mere procedural failure[s]," they lack standing to pursue a Section 15(a) claim. *Id.* at 1149.

#### 2. Plaintiffs' Section 15(c)-(e) Claims Fail Because They Do Not Plausibly Allege That ElevenLabs Encodes Voiceprints In The Relevant Models Or Makes The Models Available To Anyone

Plaintiffs' Section 15(c), (d), and (e) claims rest on the premise that their "voiceprints" are embedded within the AI models, so that using or distributing the models necessarily uses or distributes Plaintiffs' voiceprints. Even assuming (incorrectly) that Plaintiffs plausibly allege ElevenLabs used their voice recordings and turned them into voiceprints, each claim fails because Plaintiffs do not plausibly allege that hundreds of thousands of voiceprints are encoded in the models themselves or that the models were made available to anyone.

Section 15(c) "prohibits sales of biometric data," *Davis*, 2024 WL 2722663, at *8 n.4 (citation omitted), and Section 15(d) prohibits "disclos[ing], redisclos[ing], or otherwise disseminat[ing]" biometric data except in certain circumstances. Plaintiffs' theory appears to be that ElevenLabs violated Sections 15(c) and (d) simply by operationalizing the models in question. Dkt. 1 ¶¶ 149-151, 158-160. But even assuming ElevenLabs created voiceprints while training the challenged AI models, Plaintiffs do not plausibly allege that their voiceprints are embedded in the models themselves, such that ElevenLabs somehow "sells" or "discloses" Plaintiffs' voiceprints. 740 ILCS 14/15(c)-(d). Nor do they plausibly allege that ElevenLabs provides access to its AI models—as distinct from its commercial products.[2] In Plaintiffs' view, each time anybody

[2] To the extent Plaintiffs claim that Section 15(c) reaches any use of biometric data to improve technology, including through training, Dkt. 1 ¶¶ 149-150, that theory does not support a Section 15(c) claim. *See Davis*, 2024 WL 2722663, at *8 & n.4 (allegations that defendant "profited from the capture of … biometric data because the [relevant tool] improved users' experience on the website, which le[d] to increased sales volume" do not state a Section 15(c) claim).

uses the relevant products, they can access hundreds of thousands of "voiceprints." That wildly overbroad and implausible theory rests on conclusory assertions alone; Plaintiffs plead no *facts* indicating that the models' parameters contain hundreds of thousands of speaker-identifying voiceprints, that someone could use the models or their parameters to identify a particular speaker, or that ElevenLabs provides access to its models. *See supra* at 7-11.

Plaintiffs' claim under Section 15(e)—which governs the "stor[age], transmi[ssion], and protect[ion] from disclosure" of biometric data—likewise rests on the unsupported premise that ElevenLabs' products and Plaintiffs' voiceprints are somehow "the same thing." Dkt. 1 ¶¶ 1, 64, 150. But Plaintiffs cannot bootstrap themselves into a BIPA claim simply by declaring, without elaboration, that ElevenLabs' products—which they allege are distinct from its models—are "the same" as the hundreds of thousands of voiceprints purportedly used to train the models. *Cf. Kadrey v. Meta Platforms, Inc.*, 2023 WL 8039640, at *1 (N.D. Cal. Nov. 20, 2023) (holding it "nonsensical" for copyright plaintiffs to claim that the language models at issue "'are themselves infringing derivative works' [merely] because the 'models cannot function without the expressive information extracted' from the plaintiffs' books"). They must instead plausibly allege that "a biology-based set of measurements … that can be used to identify a person," *Rivera*, 238 F. Supp. 3d at 1094, was inadequately stored, transmitted, or disclosed. Plaintiffs do no such thing. And to the extent their Section 15(e) claim rests on ElevenLabs' failure to exclude or obtain consent before using Illinois-origin recordings or to maintain records sufficient to permit auditing, Dkt. 1 ¶ 170, those alleged failures do not concern the storage, transmission, or protection of biometric data so as to implicate Section 15(e).

## II. PLAINTIFFS' IRPA CLAIMS FAIL

IRPA protects an individual's right to control certain public uses of their "identity." *Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1100 (7th Cir. 2022). As relevant here, IRPA forbids

(i) publicly holding out a person's identity to advertise or sell a product without their consent and (ii) distributing or materially contributing to the distribution of an "unauthorized digital replica" of someone's voice. 765 ILCS 1075/30(a), (b), (d). Plaintiffs do not plausibly allege that ElevenLabs held out their identities to market or sell its AI voice products, or that ElevenLabs knowingly distributed or helped distribute a "digital replica" of a Plaintiff's voice.

### A. Plaintiffs Fail To Plausibly Allege That ElevenLabs Used Their Identities For A "Commercial Purpose" Under Section 30(a)

Section 30(a) of IRPA prohibits "us[ing] an individual's identity for commercial purposes" during their lifetime without consent. 765 ILCS 1075/30(a). IRPA defines "identity" to mean an "attribute … that serves to identify [an] individual to an ordinary, reasonable viewer or listener," including one's voice. 765 ILCS 1075/5. Plaintiffs' Section 30(a) claim focuses on the *inputs* for ElevenLabs' models: They allege that ElevenLabs "used [their] identities for commercial purposes" by "extract[ing] and model[ing] the distinctive vocal characteristics … to develop, train, and operate [ElevenLabs'] commercial voice synthesis products." Dkt. 1 ¶ 182. Plaintiffs' claim fails for three independent grounds.

*First*, as explained, Plaintiffs do not plausibly allege that ElevenLabs trained the relevant models on *their* voices, *see supra* at 7-9, and thus do not plausibly allege that ElevenLabs trained its models on their particular voices.

*Second*, even if ElevenLabs trained its models on their voices, Plaintiffs fail to allege the use of each of their "identities." IRPA defines "[i]dentity" as "any attribute of an individual that serves to identify that individual to an ordinary, reasonable viewer or listener." 765 ILCS 1075/5; *see Dobrowolski v. Intelius, Inc.*, 2017 WL 3720170, at *5 (N.D. Ill. Aug. 29, 2017). As explained, Plaintiffs do not plausibly allege that ElevenLabs isolated their individual voices in a way that could "identify" each of them to "an ordinary, reasonable … listener." *See supra* at 9-11.

*Third*, Plaintiffs do not allege use of their "identity for [a] commercial purpose[]." 765 ILCS 1075/30. "A free-floating profit motive is not enough" to constitute a commercial purpose under IRPA. *D'Ambrosio v. Meta Platforms, Inc.*, 176 F.4th 928, 936 (7th Cir. 2026). Rather, IRPA defines "[c]ommercial purpose" narrowly to mean the "public use or holding out of an individual's identity (i) on or in connection with the offering for sale or sale of a product, merchandise, goods, or services; (ii) for purposes of advertising or promoting products, merchandise, goods, or services; or (iii) for the purpose of fundraising." 765 ILCS 1075/5. So, to state a Section 30(a) claim, Plaintiffs must allege that ElevenLabs publicly used or held out their voices—which must identify Plaintiffs to an ordinary listener—to sell or advertise the relevant models or for fundraising purposes. Plaintiffs' allegations do not fit that mold.

Plaintiffs assert that ElevenLabs used their "voice recordings" and "characteristics to develop, train, and operate" its AI products. Dkt. 1 ¶ 182. But IRPA explicitly requires the "*public use* or *holding out* of an individual's identity." 765 ILCS 1075/5 (emphasis added). So the mere (supposed) *internal* use of Plaintiffs' voices to improve the AI models does not suffice.

Plaintiffs further allege that "ElevenLabs holds out its products' ability to generate realistic, expressive, and multilingual human-sounding voices[,] … a capability built from the identities of the individuals whose recordings supplied the training data." Dkt. 1 ¶ 182. But they do not allege that ElevenLabs held out Plaintiffs' *individual identities* to the public—much less to sell its products. As the Seventh Circuit explained, "[i]t is not enough for [a plaintiff's] name and other information to appear on or within a product"; rather, his "identity must help sell something." *Huston*, 53 F.4th at 1102 (rejecting IRPA claim where plaintiff did not allege that defendant "solicited mailing list purchasers by publicizing [plaintiff's] information" or that "her name was used to sell or promote the mailing lists themselves"); *D'Ambrosio*, 176 F.4th at 936 (similar,

where plaintiff's "image 'was not literally displayed on the[] fundraising pages,' nor were the posts linked to or from them"). For these reasons, Plaintiffs fail to state a Section 30(a) claim.

### B. Plaintiffs Fail To State A Section 30(b) Or 30(d) "Digital Replica" Claim

While Plaintiffs' Section 30(a) claim targets the alleged *inputs* of the relevant models, their Section 30(b) and (d) claims target the models' *outputs*, which they assert are "digital replicas" under IRPA. Those claims fail, too, because Plaintiffs do not plead the existence of any particular "unauthorized digital replica" of their voices, or that ElevenLabs acted with actual knowledge in distributing or materially contributing to the distribution of any such replicas.

Section 30(b) prohibits "knowingly distribut[ing], transmit[ting], or mak[ing] available to the general public a sound recording or audiovisual work with actual knowledge that the work contains an unauthorized digital replica." 765 ILCS 1075/30(b). A "[d]igital replica" is, in relevant part, "a newly created, electronic representation of the voice, image, or likeness of an actual individual created using a computer, algorithm, software tool, artificial intelligence, or other technology that is fixed in a sound recording or audiovisual work in which that individual did not actually perform or appear, and which a reasonable person would believe is that particular individual's voice, image, or likeness being imitated." 765 ILCS 1075/5. Section 30(d), in turn, imposes liability on those who "materially contribute[] to, induce[], or otherwise facilitate[]" another's violation of Section 30(b) "after having obtained actual knowledge that the other person is infringing upon an individual's rights." 765 ILCS 1075/30(d). Plaintiffs' Section 30(b) and (d) claims fail for two reasons.

*First*, Plaintiffs do not identify any "sound recording[s] or audiovisual work[s]" that contain unauthorized digital replicas of their voices. 765 ILCS 1075/30(b). Plaintiffs try to bring "digital replica" claims based on ElevenLabs' (1) default voice library and (2) voice-cloning products, Dkt. 1 ¶¶ 184-185, but they identify no specific outputs for either that are "digital

replicas" of their voices. As for ElevenLabs' default voice library, the Complaint offers no basis to conclude that any outputs would lead a "reasonable person" to think that any "particular" Plaintiff is speaking. 765 ILCS 1075/5; *supra* at 9-11; *cf. Kadrey*, 2023 WL 8039640, at *1 (rejecting theory "that 'every output of the [relevant] language models is an infringing derivative work'" where "'the complaint offer[ed] no allegation of the contents of any output'"). Plaintiffs all but concede that even *they* cannot tell whether these outputs are their voices. *See* Dkt. 1 ¶ 184. Plaintiffs also acknowledge that ElevenLabs' voice-cloning products "only allow [users] to clone [their] own voice," ElevenLabs, Professional Voice Cloning, https://elevenlabs.io/docs/eleven-creative/voices/voice-cloning/professional-voice-cloning (last visited Aug. 17, 2026) (cited Dkt. 1 ¶ 42 n.1) (explaining a user must "[v]erify [their] voice" before their voice can be cloned), as well as the voices of celebrities, but only with "consent" and pursuant to a "licens[e]," Dkt. 1 ¶¶ 5, 35, 188. Plaintiffs are not users of ElevenLabs products, *id.* ¶¶ 56-57, and the Complaint does not allege —and offers no basis to conclude—that *Plaintiffs*' voices were replicated.

*Second*, even if Plaintiffs pleaded the existence of specific digital replicas, they fail to allege ElevenLabs' "actual knowledge." 765 ILCS 1075/30(b), (d). Settled law holds that an "actual knowledge" requirement erects a high bar. As the Supreme Court held, "to have 'actual knowledge' of a piece of information, one must in fact be aware of it." *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184 (2020). Illinois law is in accord. An individual must be aware of the specific information at issue; "generalized" knowledge is not enough. *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 590 (Ill. 1996). For example, a buyer is excused from providing notice to a seller before bringing a breach of warranty claim if the seller has "actual knowledge of the defect of the particular product" purchased by the plaintiff; knowledge of "problems with a particular product line" is insufficient. *Id.* at 589-90; *see also Praither v.*

*Northbrook Bank & Tr. Co.*, 192 N.E.3d 747, 756 (Ill. App. 2021) (actual knowledge of a fiduciary's misappropriation of a principal's funds entails "'awareness at the moment of the transaction that the fiduciary is defrauding the principal'" or "express factual information" that the fiduciary's use of the funds is improper (citation omitted)).

From these principles, it follows that Plaintiffs must plausibly allege that ElevenLabs was contemporaneously aware that a particular sound recording contained an unauthorized digital replica of a particular Plaintiff's voice and then "distribute[d], transmit[ted], or ma[de] available to the general public" that work, or "materially contribut[ed] to, induc[ed], or otherwise facilitat[ed]" the same. 765 ILCS 1075/30(b), (d). Plaintiffs plead no facts supporting either contention. Rather, they assert only that ElevenLabs "knew that voice training extracts biometric identifiers," Dkt. 1 ¶ 106, and that ElevenLabs' products can be used to create replications of voices, *id.* ¶ 186. Plaintiffs' failure to plead facts supporting actual knowledge is independently fatal to their "digital replica" theory of IRPA liability.

## III. PLAINTIFFS' ICFA CLAIMS FAIL

ICFA prohibits "unfair or deceptive acts or practices" in "trade or commerce." 815 ILCS 505/2. To state an ICFA claim, a private plaintiff must plausibly allege (1) "a deceptive or unfair act"; (2) "the defendant's intent that the plaintiff rely on the deceptive or unfair practice"; (3) "that the unfair or deceptive practice occurred during a course of conduct involving trade or commerce"; and (4) that the plaintiff "suffered 'actual damage'"—meaning "actual pecuniary loss"—"as a result of the defendant's violation." *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 739 (7th Cir. 2014) (citations omitted). The statute "'imposes a proximate causation requirement' for private causes of action." *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 241 N.E.3d 454, 462 (Ill. 2024). And when brought in federal court, deception claims must satisfy Rule 9(b)'s particularity requirement. *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 738 (7th Cir. 2019).

Like BIPA, ICFA does not reach conduct that occurs outside of Illinois. *Avery*, 835 N.E.2d at 853. Because Plaintiffs do not allege conduct occurring primarily and substantially in Illinois, their ICFA claim fails. *See supra* at 11-14. Even setting aside extraterritoriality, Plaintiffs' ICFA claim still should be dismissed.

### A. Plaintiffs Fail To State An ICFA Deception Claim

Plaintiffs' ICFA deception claim fails twice over: They do not plead a deceptive statement or adequately allege proximate cause.

#### 1. Plaintiffs Fail To Allege A Deceptive Statement

A statement is deceptive under ICFA if it would likely deceive a "reasonable consumer" given the "'totality of the information' available … at the point of deception." *Kahn v. Walmart Inc.*, 107 F.4th 585, 598 (7th Cir. 2024) (citation omitted). A plaintiff must plausibly allege that a reasonable consumer would be misled by the defendant's actual representations, not "by her own assumptions." *Craw v. Clorox Co.*, 692 F. Supp. 3d 854, 860-62 (C.D. Ill. 2023) (dismissing ICFA claim); *see also Bartnett v. Abbott Lab'ys*, 492 F. Supp. 3d 787, 801 (N.D. Ill. 2020). Plaintiffs allege ElevenLabs engaged in deceptive conduct in two distinct ways. Neither states a claim.

*First*, Plaintiffs allege it was deceptive for ElevenLabs to use "hedging" language in its privacy disclosures when it stated that "applicable law *may* define [users'] Voice Data as biometric data" and that voice data "*may* comprise biometric data under applicable data protection laws." Dkt. 1 ¶ 198 (emphasis added).[3] Plaintiffs claim this language is deceptive because the voice data

---

[3] Because Plaintiffs' ICFA claim cites and is premised on ElevenLabs' Privacy Policy, CCPA Notice at Collection ("CCPA Notice"), and EU-US Data Privacy Framework, Dkt. 1 ¶¶ 6, 42, these documents are incorporated by reference and may be considered on a motion to dismiss. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). ElevenLabs' EU-US Data Privacy Framework Policy, however, is irrelevant because it applies only to "the processing of Personal Data … concerning individuals who reside in the [European Economic Area], Switzerland and the UK," *see* Declaration of Robert C. Collins III ("Collins Decl."), Ex. 1 (EU-US Data Privacy Framework Policy), and Plaintiffs are Illinois residents, Dkt. 1 ¶ 2. Further,

ElevenLabs processes is *always* biometric. *Id.* Plaintiffs reach this conclusion by misreading the Privacy Policy and omitting the "totality of the information" available to the consumer. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005) (affirming denial of ICFA claim).

When looking at the Privacy Policy in full, ElevenLabs informs users that "[f]or voice modeling, *when you provide us with recordings of your voice*, we utilize our proprietary, AI-based technologies that analyze your speech characteristics to formulate a distinct voice model of your vocal traits." *See* Collins Decl., Ex. 3 (Privacy Policy) (emphasis added). ElevenLabs thus *informs* users that when users provide recordings of their *own* voices and *ask* ElevenLabs either to create a voice model based on that voice or to process the recording for identity verification purposes, "applicable law *may* define [their] Voice Data as biometric data." *Id.* (emphasis added). These are accurate and informative statements that are not deceiving. *See Geske v. PNY Techs., Inc.*, 503 F. Supp. 3d 687, 705 (N.D. Ill. 2020) ("In [] cases [where] … other information [] dispels any inference of a false statement[,] … a court can dismiss the claim because the context as a whole shows that there was no deception."). And regardless, since Plaintiffs do not allege that they provided their voice recordings to ElevenLabs to create a voice model or perform identity verification, the statements are not relevant to Plaintiffs' theory of the case.

*Second*, Plaintiffs claim that ElevenLabs' "opacity" about the sources of its voice training data is a "material omission." Dkt. 1 ¶ 199. To plead deception based on an omission, Plaintiffs must allege "direct statements that contain material omissions," not just "opportunities or locations where [defendant] could have disclosed the alleged defect." *Guajardo v. Skechers USA, Inc.*, 503 F. Supp. 3d 746, 754-55 (dismissing ICFA claim); *see also Darne v. Ford Motor Corp.*, 2017 WL

although Plaintiffs cite to ElevenLabs' CCPA Notice, *see* Dkt. 1 ¶ 198, Plaintiffs' cited language is found in ElevenLabs' Privacy Policy, not the CCPA Notice. *Compare* Collins Decl., Ex. 2 (CCPA Notice) *with* Collins Decl., Ex. 3 (Privacy Policy).

3836586, at *10 (N.D. Ill. Sep. 1, 2017). Plaintiffs merely allege "opportunities or locations" where ElevenLabs could have disclosed sources of voice training data, claiming ElevenLabs has not published any document "identifying the speakers whose recordings were ingested into its foundational voice synthesis models." Dkt. 1 ¶ 199. That is not enough to sustain an ICFA claim. *See Guajardo*, 503 F. Supp. 3d at 755. And even if Plaintiffs had alleged "direct statements," they plead no facts plausibly indicating that ElevenLabs' *silence* as to whether publicly posted content could be used for AI training purposes would lead a reasonable consumer to believe that no such use was possible. Thus, Plaintiffs do not allege a deceptive act or practice.

**2. Plaintiffs Do Not Plausibly Allege Proximate Cause**

Plaintiffs' deception claim also fails because they do not plausibly allege proximate cause. ICFA's proximate cause requirement "means that *the plaintiff* must be the intended target of the alleged deception" and must have been "actually deceived by the misrepresentation." *Tri-Plex,* 241 N.E.3d at 462. Plaintiffs allege neither. *First*, Plaintiffs do not allege that they ever used ElevenLabs' products or that they were the intended recipients of its allegedly deceptive statements or omissions. Because Plaintiffs "d[o] not plead that [they were] the intended recipient of the defendants' alleged deceptions," they "fail[] to plead all the elements of a[n ICFA] claim." *Id.* at 465. *Second*, Plaintiffs also do not allege that they were "actually deceived" by the alleged statements or omissions. *Id.* at 462.

Plaintiffs likewise fail to allege proximate cause because they do not plead facts indicating that, "but for" ElevenLabs' deceptive conduct, they '"would not have been damaged.'" *Vanzant*, 934 F.3d at 739. Plaintiffs claim they have suffered "lost and diminished licensing income, suppressed voiceover and narration rates, diverted opportunities, and loss of control over their biometric data and professional identities." Dkt. 1 ¶ 200. As the Complaint makes clear, any diminishment in income or professional opportunities flows from the conduct of independent

actors—namely, third parties choosing AI-generated voices over human performers. *Id.* ¶¶ 64-66 (discussing alleged "commercial substitution"). The Complaint does not plead facts suggesting that, if ElevenLabs had (i) disclosed the "categorical nature of the processing ElevenLabs actually performs" or (ii) informed users about the sources of its voice training data, *id.* ¶¶ 198-199, third parties would have used human performers like Plaintiffs instead of AI-generated voices. Indeed, if a third party prefers AI-generated voices for reasons of cost or convenience, *cf. id.* ¶¶ 65-66 (discussing "commercial substitution"), a disclosure by ElevenLabs would not funnel demand back to human performers. That severs proximate cause as to any claim against ElevenLabs: "If [an] alleged cause does nothing more than furnish a condition which made the injury possible and that condition causes an injury by the subsequent independent act of a third party, the creation of that condition is not the proximate cause of the injury." *MacLeod v. ComEd*, 248 N.E.3d 1133, 1153 (Ill. App. 2024) (citation omitted).

Plaintiffs' loss-of-control theory of injury suffers from additional flaws. Insofar as it relies on the premise that ElevenLabs "collect[ed]" their biometric data, *see* Dkt. 1 ¶ 200, Plaintiffs plausibly allege no such collection. *See supra* at 7-9. Plaintiffs also plead no facts explaining why ElevenLabs' failure to make the disclosures they desire caused them to lose control over their biometric data and professional identities. *See* Dkt. 1 ¶ 200. And they fail to tie their supposed "loss of control over their biometric data and professional identities" to any pecuniary injury, as ICFA requires. *See Ramirez v. LexisNexis Risk Sols.*, 729 F. Supp. 3d 838, 846, 850 (N.D. Ill. 2024) (finding "loss of privacy" insufficient to plead actual damages" under ICFA).

**B. Plaintiffs Fail To State An ICFA Unfairness Claim**

Plaintiffs also claim that ElevenLabs' purported collection and commercial exploitation of the biometric identifiers and biometric information of Illinois persons, without their knowledge or

consent, is unfair for ICFA purposes. Dkt. 1 ¶¶ 195-197. That theory of ICFA liability fails as well, because Plaintiffs do not plead an unfair practice or (again) proximate cause.

**1. Plaintiffs Fail To Plead An Unfair Practice**

Plaintiffs allege that ElevenLabs' actions (1) offend Illinois public policy, (2) are immoral, unethical, oppressive or unscrupulous, and (3) caused substantial injury to consumers. *See id.* ¶¶ 193-197. Plaintiffs do not plausibly allege that ElevenLabs' conduct is unfair under any theory.

*First*, Plaintiffs claim ElevenLabs' conduct "offends established Illinois public policy as expressed" in BIPA and IRPA. *Id.* ¶ 195. That theory fails because Plaintiffs do not plausibly allege that ElevenLabs violated either statute. *See supra* at 6-21; *Batson v. Live Nation Ent., Inc.*, 2013 WL 992641, at *4 (N.D. Ill. Mar. 13, 2013) ("[B]ecause the practice does not violate federal or state antitrust law, it does not violate the public policies embodied in antitrust law."), *aff'd*, 746 F.3d 827 (7th Cir. 2014).

*Second*, Plaintiffs maintain that ElevenLabs' conduct is "immoral, unethical, oppressive, and unscrupulous" because it "commercially exploited the irreplaceable biometric identifiers of Illinois voice professionals" without notice, consent, or compensation. Dkt. 1 ¶ 196. But an act is unfair only when it is "so oppressive that the consumer has little choice but to submit." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir. 2010). "[T]his element is not satisfied if a consumer can avoid the defendant's practice by seeking an alternative elsewhere." *Batson*, 746 F.3d at 833 (upholding dismissal of ICFA unfairness claim). Plaintiffs do not allege that ElevenLabs' consumers were forced to use its products; instead, as Plaintiffs acknowledge, ElevenLabs' users had alternatives, including other AI services, ElevenLabs' platform (the Iconic Marketplace) that Plaintiffs claim is based on proper consents, and services offered by Plaintiffs' themselves. Dkt. 1 ¶¶ 64-65 (discussing "[c]ommercial [s]ubstitution"); *id.* ¶ 196. Plaintiffs do not allege an unfairness claim on this basis.

*Third*, Plaintiffs' allegation that ElevenLabs' actions caused "substantial injury to *Plaintiffs and Class members*," *id.* ¶ 197 (emphasis added), misunderstands the relevant test. A "substantial injury to consumers" must be one that "*consumers* themselves could not reasonably have avoided." *Kahn*, 107 F.4th at 603 (emphasis added). This test reflects ICFA's focus on consumer protection by asking whether *consumers* are injured. Plaintiffs' claimed injuries (lost income and job opportunities, Dkt. 1 ¶ 200) are, at most, injuries to purported *competitors* to the challenged products, not to *consumers*, as they are not the types of harms (e.g., paying inflated prices, receiving defective goods, being defrauded in a transaction) that a consumer would suffer in the marketplace. *Cf. Speakers of Sport, Inc. v. ProServ, Inc.*, 178 F.3d 862, 868 (7th Cir. 1999) ("[T]o allow [a competitor] to obtain damages … when no consumer has been hurt is unlikely to advance the consumer interest."). Plaintiffs are not users of ElevenLabs' products, Dkt. 1 ¶¶ 70, 75, 80, 85, 90, 95, 100, and ICFA does not "protect competitors" like Plaintiffs "from competition," *Speakers of Sport*, 178 F.3d at 868.

### 2. Plaintiffs Fail To Plead Proximate Cause

Plaintiffs again fail to plead proximate cause. *See supra* at 24-25. Although Plaintiffs claim it was "unfair" for ElevenLabs to use their biometric data, they do not plead facts plausibly showing that, if ElevenLabs had used no BIPA-protected content to train its models, or if ElevenLabs had obtained consent to use such material, third parties would have employed Plaintiffs or other voice performers in place of AI-generated voices. *Cf. MacLeod*, 248 N.E.3d at 1153. As a result, Plaintiffs' ICFA claim should be dismissed.

## IV. PLAINTIFFS' IUDTPA CLAIM FAILS

IUDTPA prohibits conduct that causes a likelihood of confusion or misunderstanding as to (a) the source or sponsorship of goods or services or (b) affiliation, connection, or association with another. *See* 815 ILCS 510/2(a)(2)-(3). A plaintiff "likely to be damaged" by such conduct may

obtain injunctive relief. 815 ILCS 510/3. Here, Plaintiffs rely on an omission theory that is not cognizable, fail to plausibly allege their omission theory, and fail to plead that the injuries they fear are likely to be caused by ElevenLabs' conduct, as opposed to the conduct of third parties.[4]

*First*, Plaintiffs' IUDTPA claim rests on an improper *omission* theory. They allege ElevenLabs offered voices that "sound like real human speakers"—without disclosing "that the voice was AI-generated, that the model that generated the voice was built using voiceprints collected without consent, or that the individual whose vocal characteristics are reproduced has not authorized its use." Dkt. 1 ¶ 206. Plaintiffs do not allege that ElevenLabs made any *affirmative* representations that the voices were *not* AI-generated, the models were built *without* voiceprints, or the individuals whose voices the models ostensibly imitated *did* authorize that use.

This theory of deception is not cognizable under IUDTPA. "[F]or a[n] [IUDTPA] violation to occur, the defendant must make some form of a representation (or do something) to the public (or a potential buyer) regarding a good or service." *Lynch Ford, Inc. v. Ford Motor Co.*, 957 F. Supp. 142, 147 (N.D. Ill. 1997). Where there "is no alleged representation by [the defendant] to anyone concerning an identifiable good or service," a Section 2(a) claim fails. *Id.* (dismissing IUDTPA claim premised on alleged concealment).[5]

*Second*, even if an omission theory were sufficient, Plaintiffs' claim that ElevenLabs'

---

[4] Courts apply Rule 9(b) to IUDTPA claims, *e.g., Lawrence v. Trax Recs., Inc.*, 2025 WL 919616, at *2 (N.D. Ill. Mar. 26, 2025), but Plaintiffs' IUDTPA claim fails under Rule 8(a) as well.

[5] Plaintiffs' claim that ElevenLabs failed to disclose that its voices are AI-generated, Dkt. 1 ¶ 206, is entitled to no weight. The ElevenLabs website, which the Complaint incorporates by reference, *see supra* at n.3; Dkt. 1 ¶ 25, repeatedly states that ElevenLabs' products are AI-generated. *See, e.g.*, Collins Decl., Ex. 4 (ElevenLabs' homepage) (highlighting ElevenLabs' "leading AI voice generator," its "multilingual AI voice technology," and its stated belief that consumers "should know if audio is AI-generated"). Where, as here, materials incorporated by reference contradict the complaint's allegations, the materials control. *See Bogie v. Rosenberg*, 705 F.3d 605, 608-09 (7th Cir. 2013).

statements create a "likelihood of confusion" is conclusory. Plaintiffs maintain that "the absence of a disclosure" creates confusion about whether real persons created, endorsed, sponsored, or approved any affiliation with the AI-generated voice content. Dkt. 1 ¶ 206. But Plaintiffs were not confused, as they have not used ElevenLabs' products, *id.* ¶¶ 70, 75, 80, 85, 90, 95, 100; do not claim they believed the AI voices belonged to real persons; and know they did not offer consent to ElevenLabs to use their voices, *id.* ¶ 182. Plaintiffs merely speculate that ElevenLabs' statements create a general likelihood of confusion as to the source or affiliation of its AI voices and do not allege a likelihood of confusion beyond a "speculative level," requiring dismissal. *Mercis, B.V. v. Individuals*, 2025 WL 540509, at *7 (N.D. Ill. Feb. 19, 2025).

*Third*, Plaintiffs do not plausibly allege they are likely to be damaged by ElevenLabs' conduct in the future, or that the injunctive relief they seek would redress their claimed harms. *See ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 282 F. Supp. 3d 1043, 1050 (N.D. Ill. 2017) ("The likelihood of future harm occurring absent an injunction is an element of liability on [an IUDTPA] claim."). Plaintiffs posit two theories, neither of which succeeds.

The first theory submits that Plaintiffs are likely to be damaged in the future because ElevenLabs' omissions "divert[] demand from licensed human voice performances." Dkt. 1 ¶ 207. The theory rests on the premise that, if ElevenLabs disclosed that the outputs of the challenged models were AI-generated and not authorized by "the individuals whose vocal characteristics are reproduced," then (1) third parties would be less likely to use AI-generated audio; (2) they would use human performers instead; and (3) these particular Plaintiffs would likely benefit. *See id.* ¶¶ 206-208. But Plaintiffs offer no allegations suggesting that, if presented with these additional disclosures, third parties would choose to use human voice performers—much less these Plaintiffs—over AI-enabled alternatives.

The second theory submits that Plaintiffs are likely to be damaged in the future because ElevenLabs' omissions "impair[] source attribution and authorization-status disclosure in the voice services markets where Plaintiffs and Class members earn their livelihoods." *Id.* ¶ 207. But "[o]nce generated," ElevenLabs' "voice outputs can be downloaded, shared, and commercially exploited … without consumer-facing disclosure[s]." *Id.* ¶ 206. In other words, an order requiring ElevenLabs to attach Plaintiffs' desired disclosures at the point of generation would not prevent third parties who later download, share, and commercially exploit those outputs from stripping away any disclosures ElevenLabs had attached.

As a result, Plaintiffs do not plausibly allege that forcing ElevenLabs to make particular disclosures would actually prevent any downstream harm to them. Plaintiffs' claimed injuries thus are "not the type of harm that the Court is able to issue an injunction against," because the injuries depend on the conduct of third parties whom ElevenLabs does not control. *Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749, 773 (C.D. Ill. 2020) (explaining that "the Court cannot stop hackers from using [plaintiffs'] information in the future," and dismissing IUDTPA claim).

## V. PLAINTIFFS' UNJUST ENRICHMENT CLAIM FAILS

"Under Illinois law, unjust enrichment is not a separate cause of action." *Vanzant*, 934 F.3d at 739 (citation omitted). Rather, it's "a condition brought about by fraud or other unlawful conduct." *Id.* at 740. As this Court has explained, "unjust enrichment stands on the shoulders of some other claim." *Love v. Simmons*, 2024 WL 809107, at *16 (N.D. Ill. Feb. 27, 2024). "So, if an unjust enrichment claim rests on the same improper conduct alleged in another claim … unjust enrichment will stand or fall with the related claim." *Id.* (citation omitted). Because Plaintiffs' "substantive claims fail," they "can't recover for unjust enrichment, either." *Id.*

## CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint in its entirety.

Dated: August 17, 2026

Respectfully submitted,

*/s/ Gary Feinerman*
Gary Feinerman (Illinois Bar No. 6206906)
Robert C. Collins III (Illinois Bar No. 6304674)
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767
Email: gary.feinerman@lw.com
robert.collins@lw.com

*Counsel for Defendant Eleven Labs Inc.*

**CERTIFICATE OF SERVICE**

I, Gary Feinerman, hereby certify that on August 17, 2026, I caused the foregoing to be filed with the clerk of the court using the Court's CM/ECF system, which will serve electronic notice upon all parties of record.

*/s/ Gary Feinerman*
Gary Feinerman